735 A.2d 448 (1999)
In re K.I., B.I. and D.M., Appellants.
Nos. 98-FS-1683 and 98-FS-1767.
District of Columbia Court of Appeals.
Argued May 13, 1999.
Decided July 29, 1999.
*450 William J. Driscoll, appointed by the court, for appellant B.I.
Lawrence H. Huebner, Centreville, VA, appointed by the court, for appellant D.M.
Karen Aileen Howze, Washington, DC, appointed by the court as guardian ad litem, for appellee K.I.
Kenneth H. Rosenau, Washington, DC, appointed by the court as medical guardian ad litem, for appellee K.I.
Al J. Gonzalez, appointed by the court, for C.R., filed a statement.
John M. Ferren, Corporation Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corporation Counsel, and Mary T. Connelly, Assistant Corporation Counsel, filed a memorandum in lieu of brief for the District of Columbia.
Edward J. Krill and William J. Carter, Washington, DC, filed an amicus curiae brief for the Hospital for Sick Children; the Medical Society of the District of Columbia; the American Medical Association, through the A.M.A. State Medical Society Litigation Center; Professors Robert F. Drinan, S.J. and Kevin Quinn, S.J. of the Georgetown University Law Center; and Dr. John J. Lynch on behalf of the Metropolitan Washington Bioethics Network.
Before TERRY and REID, Associate Judges, and MACK, Senior Judge.
REID, Associate Judge:
This poignant matter involves a "do not resuscitate" order ("the DNR") entered by the Superior Court of the District of Columbia in the case of a neglected child, K.I., who, since birth approximately two years ago, has suffered continuously from several serious medical problems. Currently the child is in a comatose state and has been described as "neurologically devastated." The DNR, entered together with a comprehensive memorandum opinion by the trial judge, the Honorable Rafael Diaz, provides that: "[I]n the event of cardiac and/or pulmonary arrest, the following procedures for resuscitation shall represent the exclusive methods of intervention to be performed on [K.I.]: (1) Blow by Oxygen[;] (2) Bag-Mask Ventilation[; and] (3) Intra-muscular & Sub-cutaneous Medications."
Both B.I., K.I.'s biological mother, and D.M., K.I.'s putative father, noted appeals from the trial court's judgment. B.I. contends that (1) as a parent, she has the right to decide that K.I. should be resuscitated, and thus, the court erred by applying the best interests of the child standard, instead of the substituted judgment test (which would have allowed her to be the surrogate for the child), in deciding whether to issue the DNR; and (2) the court actually and improperly based its judgment on the preponderance of the evidence standard governing neglect proceedings rather than clear and convincing evidence. D.M., contrary to the position of B.I., supports the DNR but also complains that the trial court should have recognized his alleged right to parental privacy and parental autonomy.
We affirm because we conclude that (1) the trial court properly exercised its parens patriae authority in a case involving a prior neglect adjudication, and did not err in deciding to apply the best interests of the child rather than the substituted judgment standard; nor did it abuse its discretion in determining that issuance of the DNR was in the best interests of K.I.; (2) the trial court in fact based its judgment on the clear and convincing evidentiary standard; and (3) D.M. failed to assert any parental rights in the trial court to which he may be entitled; however, any such rights have not been terminated.
As an appendix to this opinion, we attach the extensive and thoughtful memorandum opinion and order of the trial judge.

FACTUAL SUMMARY
The record before us shows the following facts. On June 15, 1997, K.I. was born *451 prematurely at twenty-six weeks gestation. K.I.'s treating physician at the Hospital for Sick Children, Dr. Glenn Hornstein, who testified at the DNR hearing, stated that as a result of the premature birth, K.I. "developed BPD; or broncho pulmonary dysplasia," an abnormal condition of the lung cells which requires the child to use oxygen. In addition, K.I. suffered from "hemoglobin SC disease, which is similar [to] or it is sickle cell disease, just a mild variance"; "reactive airways disease," characterized by wheezing; and "gastroesophageal refl[u]x."
K.I. was released from the neonatal intensive care unit of the hospital in November 1997 to the biological mother, B.I. Beginning on November 24, 1997, for a period of five weeks, B.I. and K.I. stayed in an apartment in the Northwest sector of the District of Columbia with D.M., K.I.'s putative father who claims to be K.I.'s biological father.[1] K.I. was required to wear a heart monitor and an apnea monitor, take medication for the lungs, and use oxygen continuously. D.M. became concerned when B.I. would take K.I. off the oxygen and heart monitor and fail to give the child the lung medication. He also was troubled when he saw B.I. consume about three "40-ounce . . . very strong beer[s]" every day. He stated, at the August 26, 1998 neglect proceeding, that B.I. became intoxicated and would "start stumbling and falling and get very silent and have a nasty attitude." B.I. would "leave the house and leave [D.M.] there with the baby and come back a day later or two days later." On December 28, 1997, B.I. left D.M.'s home. She carried K.I. with her but failed to take the oxygen. D.M. alerted Howard University that K.I. was without her oxygen.
On December 29, 1997, in response to D.M.'s alert, Edmond Lahai, then an employee of the District of Columbia Department of Human Services, Children and Family Services Administration, searched for B.I. and K.I. When he located B.I., she initially denied that K.I. was with her. Mr. Lahai found two Metropolitan Police officers, and when he returned with the police to the abode where B.I. was staying, she admitted that K.I. was with her. K.I. had no oxygen and no monitors.
A neglect petition was filed against B.I. on December 31, 1997, under D.C.Code § 16-2301(9)(B), (C), and (F). The petition alleged that B.I. failed to: (1) provide K.I. with the requisite medical care; (2) schedule appointments for K.I., and (3) use K.I.'s monitoring devices or tube feeding procedure. Mr. Lahai testified, at the hearing on the neglect petition, that when he saw B.I. on December 29, 1997, she "slurred . . . her speech, . . . was incoherent[,] would not walk straight and . . . had a strong smell of alcohol."[2]
On December 29, 1997, Mr. Lahai took K.I. to Howard University Hospital. Later, K.I. was transferred to the Hospital for Sick Children. When K.I. began to experience respiratory distress at the Hospital for Sick Children and her condition worsened, Dr. Hornstein transferred the child to Children's Hospital on July 21, 1998. On that same day, K.I. went into cardiac arrest and suffered hypoxia, which *452 involves "a deprivation of oxygen to the cells and to the brain." Resuscitation efforts lasted for approximately twenty-five minutes. After the resuscitation efforts ceased, K.I.'s heart began to function again. However, the following day she experienced a seven-hour seizure which terminated only after the administration of "phenobarbital medication which . . . put K.I. into a pentobarb-like coma . . . to control the seizure."
On August 22, 1998, K.I. was returned to the Hospital for Sick Children, where she continued to experience severe medical problems. At the DNR hearing, Dr. Hornstein described the child's current condition  no "purposeful movements," persistent "myochronic jerks" [involving] "shaking of [the] arms and legs." In addition, according to Dr. Hornstein, K.I. "withdraws to pain or . . . feels discomfort when people do interventions such as . . . when [he] attempted to place [an] IV in [K.I.'s] . . . hand, [K.I.] actually was grimacing and sort of writhing and moving around as if in discomfort."
Due to K.I.'s persistent medical problems, the trial court "held a hearing to determine the propriety of aggressive resuscitation efforts in the event that [K.I.] suffered pulmonary or respiratory arrest." Several persons testified, including experts in pediatric critical care, bioethics, and ethics as well as B.I. and D.M. B.I. opposed the DNR, asserting her right as a parent to make any decision concerning the nature of resuscitation efforts. D.M. agreed with the issuance of the DNR. The testimony taken at the DNR hearing is described in the attached copy of the trial court's memorandum opinion and order. Suffice it to say here that according to the trial court's memorandum opinion, signed on October 16, 1998, Dr. Gabriel Jacob Hauser, a professor of bioethics at Georgetown University, the Chief of Pediatric Critical Care Service at the Georgetown University Hospital, and the former chair of the hospital's ethics committee, testified that: "While [K.I.] is capable of feeling pain and discomfort, [the child] responds to no other stimuli; . . . is unable to react to [the] environment, cannot contemplate events taking place [in close proximity], and is incapable of giving or receiving love." Furthermore, "the possible resuscitation efforts that would be used on [K.I.] in the event of cardiac arrest or respiratory failure, assuming no DNR order is in place . . . . [w]ould entail substantial amounts of pain and discomfort."
The trial court concluded that because of its jurisdiction over a neglected child and its role as parens patriae, it had the authority to determine whether to issue the DNR, but that:
[T]he issuance of a DNR order must be predicated upon a finding by clear and convincing evidence both that it is in [K.I.'s] best interests to forego aggressive revival measures, and that [B.I.'s] refusal to consent to the issuance of the DNR order is unreasonably contrary to [K.I.'s] well-being.
In addition, the court determined that the best interests of the child rather than the substituted judgment standard applied "in cases involving minor respondents who have lacked, and will forever lack, the ability to express a preference regarding their course of medical treatment." Under the best interests of the child standard, the court was "satisfied by clear and convincing evidence, that upon balancing the burdens of continued life against the benefits and rewards of furthering life, [K.I.'s] best interests would be served by issuing a DNR order." In reaching its decision, the court recognized that B.I. "refused to co-operate with hospital staff regarding [K.I.'s] medical needs, had removed [K.I.] from [the] apnea and oxygen monitors, and had terminated [the] tube feeding procedure." Moreover, in light of the expert testimony provided at the DNR hearing, B.I.'s "sporadic history of attending to [K.I.'s] medical needs, and [B.I.'s] statements made to [the trial] court regarding her desire to keep [K.I.] alive at all costs," the trial court found B.I.'s "refusal to consent *453 to the entry of [the DNR to be] both unreasonable and contrary to [K.I.'s] best interests."

ANALYSIS
B.I. argues that, as a parent, she has the right to determine whether, and in what manner, K.I. should be resuscitated, and thus, the court erred by applying the best interests of the child instead of the substituted judgment standard in deciding whether to issue the DNR. She also maintains that the court based its judgment upon the preponderance of the evidence, the standard governing neglect proceedings, rather than clear and convincing evidence. K.I.'s guardian ad litem argues that (1) under the concept of parens patriae, the trial court had authority to issue the DNR; (2) the court properly used the best interests of the child standard in this neglect case without infringing on the rights of the parents; and (3) the appropriate clear and convincing standard was applied and the evidence was sufficient to support the court's judgment. D.M. asserts that the DNR should be upheld but "with reservation of parental rights of determination vested in the father, with the Court as arbiter only of parental differences of opinion and with the suggested ethics committee guidelines and mechanisms." K.I.'s medical guardian ad litem suggests that the trial court (1) had jurisdiction to enter the DNR under D.C.Code § 16-2320(5), see infra, and under its authority to order physical and mental examinations pursuant to § 16-2315; (2) properly adopted the clear and convincing evidentiary standard; and (3) did not err in concluding that the evidence was sufficient to support the issuance of the DNR.[3] Finally, the amici curiae, consisting of the Hospital for Sick Children where K.I. receives medical care, the Medical Society of the District of Columbia, the American Medical Association (through its State Medical Society Litigation Center), two professors of law from the Georgetown University Law Center, and the Metropolitan Washington Bioethics Network, also support the DNR because "the best interest of [K.I.] is served by the establishment of a reasonable plan of medical care which is premised on the very limited benefits available to [K.I.] from medical science."[4]
We review the trial court's legal determinations de novo and accept its findings of fact unless they are "clearly erroneous." In re J.D.W., 711 A.2d 826, 830 (D.C.1998) (citations omitted); D.C.Code § 17-305(a) (1997) ("When the case was tried without a jury, the court may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it.").

The Jurisdictional Issue
We turn first to the issue of the trial court's jurisdiction over this matter. We conclude that the trial court properly exercised jurisdiction over this matter because of the adjudication of K.I. as a neglected child; the trial court's role as parens patriae; the disagreement of the biological mother, B.I., and the putative father, D.M., as to whether K.I. should be resuscitated in the event of cardiac arrest or respiratory distress; the serious medical condition of K.I.; and the best interests of the child concept.
The Family Division of the Superior Court ("the Division") has jurisdiction *454 over cases pertaining to neglected children. In exercising its jurisdiction, the Division "may make such . . . disposition as is not prohibited by law and as the Division deems to be in the best interests of the child." D.C.Code § 16-2320(a)(5). See also In re E.H., 718 A.2d 162, 169 (D.C.1998); In re L.J.T., 608 A.2d 1213, 1215 (D.C.1992) (citations omitted); In re J.S.R., 374 A.2d 860, 863 (D.C.1977) (citations omitted). There is substantial evidence in the record showing that while K.I. was under the care of B.I., B.I. frequently consumed alcohol, took away K.I.'s required oxygen and monitors for apnea and the heart, and failed to provide adequate care for the child; thus, K.I. was properly adjudicated a neglected child.
Given the lack of appropriate attention and care by B.I., the trial court assumed its role as parens patriae "to promote [K.I.'s] best interest," In re S.K., 564 A.2d 1382, 1388 (D.C.1989) (citing In re Lem, 164 A.2d 345, 348 (D.C.1960) (other citation omitted)), and to provide necessary relief. In In re J.J.Z., 630 A.2d 186 (D.C.1993), we recognized that "[t]he court's role as parens patriae in neglect proceedings is well established in this jurisdiction. . . [and] allows [it] . . . to provide the relief necessary to protect the best interests of the child." Id. at 193 (citations omitted). The court's exercise of its discretion as parens patriae was essential since the District government took no position on the resuscitation issue and because B.I. and D.M. had a fundamental disagreement concerning resuscitation  D.M. supported the need for the DNR, while B.I. opposed the DNR and favored the use of a variety of medical techniques, "including intubation, defibrillation (shock with electric paddles), and interosseous efforts at introducing medication into [K.I.'s] system" in an effort to reverse any cardiac arrest or respiratory distress.[5] B.I.'s goal is to keep K.I. "breathing." Moreover, in light of the fact that K.I. has been described as "neurologically devastated," feels and reacts to pain and discomfort but not to other stimuli, has no reaction to the surrounding environment, cannot give or receive love or express a view; and because some of the resuscitation techniques engender substantial pain and discomfort, we cannot fault the trial court's decision to issue the DNR based upon guidance from medical experts and consistent with the best interests of K.I., rather than abiding by B.I.'s wishes.
Although biological parents have a "fundamental liberty interest . . . in the care, custody, and management of their child [which] does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State[,]" Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re T.J., 666 A.2d 1, 11 (D.C.1995), that interest is not absolute since "[t]he paramount concern is the child's welfare and all other considerations, including the rights of a parent to a child, must yield to its best interests and well-being." Davis v. Jurney, 145 A.2d 846, 849 (D.C.1958); see also In re Baby Boy C., 630 A.2d 670, 682 (D.C.1993) ("While the Supreme Court has held that the rights of natural parents to bring up their children are subject to the protection of the Due Process Clause of the Fourteenth Amendment (and hence the Fifth Amendment), `these rights are not absolute, and must give way before the child's best interest'") (quoting In re A.B.E., 564 A.2d 751, 755 (D.C.1989) (citation and footnote omitted)). Although B.I. clearly has a liberty interest "in the care, custody and management of [K.I.]," Santosky, supra, 455 U.S. at 753, 102 S.Ct. 1388; see also Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), K.I.'s well-being takes precedence over B.I.'s parental rights. Davis, supra, 145 A.2d at 849.
*455 In short, the trial court did not err in exercising jurisdiction over the DNR issue rather than yielding to B.I.'s wishes as a parent.

The Substituted Judgment Versus the Best Interests of the Child Standard
B.I. insists that, after the trial court decided to exercise jurisdiction over the DNR matter, the court should have applied the substituted judgment rather than the best interests of the child standard in determining whether to issue the DNR. She states that "[t]he District of Columbia is a `substituted judgment' jurisdiction" and cites cases from this and other jurisdictions applying the substituted judgment standard. We conclude that the trial court did not err in rejecting the substituted judgment in favor of the best interests of the child standard.
Historically, the substituted judgment standard arose in estate cases involving incompetent persons, and generally has been invoked in cases of adults who at one time were competent but later became incompetent. See In re A.C., 573 A.2d 1235, 1249 (D.C.1990) (en banc); Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417, 431 (1977). In applying the doctrine, "[t]he court, as surrogate for the incompetent, is to determine as best it can what choice [the] individual, if competent, would make with respect to medical procedures." In re Boyd, 403 A.2d 744, 750 (D.C.1979) (footnote omitted). "[T]he substituted judgment inquiry is primarily a subjective one," A.C., supra, 573 A.2d at 1249, and in both In re A.C. and In re Boyd, supra, we set forth factors to be followed in ascertaining the decision that the incompetent person would make. These factors include giving "the greatest weight . . . to the previously expressed wishes of the patient." In re A.C., supra, 573 A.2d at 1249-50. As we said in In re A.C.,
to determine the subjective desires of the patient, the court must consider the totality of the evidence, focusing particularly on written or oral directions concerning treatment to family, friends, and health-care professionals. The court should also take into account the patient's past decisions regarding medical treatment, and attempt to ascertain from what is known about the patient's value system, goals, and desires what the patient would decide if competent.
Id. at 1251 (citations omitted).
In In re Barry, 445 So.2d 365, 371 (Fla. App. 2 Dist.1984), the court noted that: "The [substituted judgment] doctrine has been helpful in the case of adults, but it is difficult to apply to children or young adults." Indeed, most of the substituted judgment cases cited by B.I., including those from this jurisdiction, In re A.C., supra, and In re Boyd, supra, concerned adults. See Mack v. Mack, 329 Md. 188, 618 A.2d 744 (1993); In re Estate of Longeway, 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 (1990); Superintendent of Belchertown, supra. Moreover, unlike K.I.'s situation, in one of the cases cited by B.I. which involved a minor, there was no neglect adjudication, and both parents agreed to petition the court for approval to remove life support systems. See In re Barry, supra. In the other case regarding a child, Custody of a Minor, 385 Mass. 697, 434 N.E.2d 601 (1982), the court took into consideration the best interests of the child in reaching its conclusion. Id. at 609 ("[T]he Juvenile Court judge applied the substituted judgment test and examined the best interests of the child.").
To attempt to apply the substituted judgment test in this case where B.I. and D.M. disagree; where K.I., a child born in June 1997, has never been healthy; has issued no oral or written directives as to medical matters or formed any opinions about anything, let alone a value system; not only would be impossible, but also would violate the spirit of the substituted judgment standard, the purpose of which is to implement the wishes of the incompetent individual. Consequently, we hold, consistent with the trial court's memorandum *456 opinion, that "in cases involving minor respondents who have lacked, and will forever lack, the ability to express a preference regarding their course of medical treatment," and where the parents do not speak with the same voice but disagree as to the proper course of action, the best interests of the child standard shall be applied to determine whether to issue a DNR.

The Evidentiary Standard
Contrary to B.I.'s argument, we are satisfied that the trial court applied the clear and convincing evidence test rather than relying primarily upon factual findings from the neglect adjudication which were made in accordance with the preponderance of the evidence standard. For the reasons stated by the trial judge, we hold that the standard of proof required for the issuance of a DNR in the best interests of a child is clear and convincing evidence.
In this case, the trial court specifically stated that "the issuance of [its] DNR order must be predicated upon a finding by clear and convincing evidence both that it is in [K.I.'s] best interests to forego aggressive revival measures, and that [B.I.'s] refusal to consent to the issuance of the DNR order is unreasonably contrary to [K.I.'s] well-being." Further, the court "[was] satisfied, by clear and convincing evidence, that upon balancing the burdens of continued life against the benefits and rewards of furthering life, [K.I.'s] best interests will be served by issuing a DNR order." Thus, the main focus of the court was on the medical condition of K.I., the impact that aggressive and invasive resuscitation procedures would have on K.I. such as the inducement of pain, discomfort and additional neurological damage. The court did reference the findings of neglect relating to B.I.  her drinking and failure to keep K.I. on oxygen and required monitors. In concluding that B.I.'s "refusal to consent to the entry of [the DNR] is both unreasonable and contrary to [K.I.'s] best interests," however, the court emphasized B.I.'s lack of cooperation with the hospital staff and her singular goal of keeping K.I. breathing, as evidenced by her statement, "any amount of pain is worth it as long as [K.I.] breathes."
In short, in exercising its role as parens patriae and guided by testimony of several medical, bioethics, and ethics experts in this case where there was a prior adjudication of neglect, the trial court, carefully and thoughtfully, determined by clear and convincing evidence that it was in K.I.'s best interests to avoid use of aggressive resuscitation efforts which cause pain and discomfort. "`Application of the best interests of the child standard in a particular case presents one of the heaviest burdens that can be placed on a trial judge . . . . In reviewing this difficult decision, we will reverse only for an abuse of discretion.'" In re Baby Boy C., supra, 630 A.2d at 683 (quoting In re D.I.S., 494 A.2d 1316, 1323 (D.C.1985) (citations omitted)). We see no abuse of discretion in this matter.
Consequently, for the foregoing reasons, we affirm the judgment of the trial court.[6]
So ordered.

APPENDIX

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA FAMILY DIVISION

INTRAFAMILY AND NEGLECT BRANCH
*457
In the Matter of
K.I.,
Respondent.

N-1639-97; SF-207792

Hon. Rafael Diaz

MEMORANDUM OPINION AND ORDER
This matter comes before the Court for consideration of the medical guardian ad litem's request for the issuance of a "Do Not Resuscitate" ("DNR") order to prevent resuscitation of respondent, K.I., a one year old infant who has been adjudicated a neglected child. The mother and one of two putative fathers oppose the issuance of a DNR order.

I
The condition of respondent, K.I., is medically fragile. Born premature at twenty-six weeks gestation, respondent suffered from cerebral palsy and sepsis, among other ailments. As a result of these conditions, K.I. underwent a cardiac arrest on July 23, 1998, and was without a heartbeat for approximately twenty-five (25) minutes. While efforts to resuscitate were successful in restoring circulation and respiration, the event caused prolonged hypoxia and swelling of the brain tissue. This in turn led to an eight (8) hour seizure from which K.I. was relieved by being drugged into a comatose state. Presently, K.I.'s condition is described as "neurologically devastated." K.I.'s physicians agree that K.I.'s chances of regaining cognitive ability are virtually nonexistent, and any extraordinary attempts towards resuscitation are likely to be highly invasive and painful. The physicians have, therefore, recommended that if K.I. suffers respiratory or pulmonary failure, no aggressive efforts be made to resuscitate K.I. Respondent's mother, Ms. B.I., as well as her putative father, Mr. C.R. oppose the issuance of a DNR order.
To determine whether or not a DNR order should issue in this matter, the Court will review the factual and procedural history of the case, consider the Court's power to issue a DNR order over the objection of a biological mother of a respondent who has been adjudicated neglected, discuss the appropriate standard for the issuance of such an order, then evaluate whether it is in K.I.'s best interest to be resuscitated by extraordinary means should K.I. suffer cardiac arrest or respiratory failure.

II
The factual and procedural background of this matter begins on December 31, 1997, when a neglect petition was filed, claiming that K.I. was neglected pursuant to D.C.Code § 16-2301(9)(B), (C) & (F). Particularly, it was alleged that K.I. was born premature with many medical needs. The petition states that upon the respondent's medical discharge from the hospital, Ms. B.I. failed to follow through with her medical care and other needs. Ms. B.I. refused to cooperate with hospital staff regarding scheduled appointments, took K.I. off medical monitoring devices, including apnea and oxygen monitors, and terminated K.I.'s tube feeding procedure. Finally, the petition details how social workers, with the assistance of Metropolitan Police Officers, entered Ms. B.I.'s abode on December 29, 1997, and found K.I. therein, suffering from a high fever and in respiratory distress. K.I. was rushed to the hospital and treated for ailments.
After a fact-finding hearing on August 26, 1998, the Court determined, by the preponderance of the evidence, that K.I. had been neglected pursuant to D.C.Code § 16-2301(9)(B), (C) & (F). On the same date, the Court held a disposition hearing in the matter and committed K.I. to the Department of Human Services.
On August 18, 1998, approximately one week prior to the neglect adjudication, the medical guardian ad litem, Kenneth Rosenau, *458 had filed a report detailing K.I.'s current medical condition and future prognosis. Mr. Rosenau requested the issuance of a DNR order. The Court scheduled an evidentiary hearing and issued a "show cause" order on August 27, 1998, directing the mother,[1] as well as all other parties, to appear before the Court on September 4, 1998, and show cause why a DNR order should not be issued.
On September 4, 1998, the Court held a hearing to determine the propriety of aggressive resuscitation efforts in the event that K.I. suffered pulmonary or respiratory arrest. All parties were present for the hearing, including the mother, and respondent's putative fathers, D.M. and C.R.[2] At the outset of the hearing, the Court surveyed the parties regarding their positions on the issuance of the DNR order. Respondent's guardian ad litem, medical guardian ad litem, and Mr. D.M. were in favor of a DNR order. However, such action was opposed by Ms. B.I. and Mr. C.R.[3]
Six of the seven witnesses who testified at the hearing were called by the medical guardian ad litem. The seventh witness was respondent's mother who testified on her own behalf. Dr. Gabriel Jacob Hauser, the first witness, is the Chief of Pediatric Critical Care Service at the Georgetown University Hospital and has formerly served as chairman of the hospital ethics committee.[4] He is currently a professor of bioethics at Georgetown University. Dr. Hauser was accepted by the Court, without objection, as an expert in the areas of pediatric medicine and bioethics.
Doctor Hauser testified that K.I. is currently not dependent on significant life-support measures  K.I. is able to breathe on K.I.'s own, and K.I.'s heart beats independently[5]  but he described K.I. as neurologically devastated. While K.I. is capable of feeling pain and discomfort, K.I. responds to no other stimuli; K.I. is unable to react to her environment, cannot comprehend events taking place around K.I., and is incapable of giving or receiving love.[6] The doctor described the possible resuscitation efforts that would be used on K.I. in the event of cardiac arrest or respiratory failure, assuming no DNR order is in place. According to the doctor, many of the procedures would entail substantial amounts of pain and discomfort.
Dr. Hauser opined that if K.I. suffers a cardiac arrest or respiratory failure, no aggressive efforts at resuscitation should be made. This conclusion was reached by weighing the burdens of resuscitation procedures (pain and discomfort) against the benefits of successfully restarting K.I.'s heart or respiration. He further concluded K.I. will never regain normal neurological functioning, and will at best maintain K.I.'s current cognitive status. Further, while the pain endured in resuscitation is likely to be great, the utility of such efforts is dubious. Resuscitation is unlikely to be successful, and, even if K.I. is revived, K.I. will likely emerge from the experience more neurologically damaged than at present. *459 Accordingly, Dr. Hauser recommended the Court issue a DNR order.
Dr. Glenn Hornstein, respondent's treating physician at Washington Hospital for Sick Children, was the next witness. Dr. Hornstein confirmed the grim portrait previously painted of K.I.'s condition and prognosis, stating that K.I. lives in a crib with no purposeful movement, fails to react when picked up, and must be repositioned every few hours to avoid developing bedsores. The doctor also confirmed K.I.'s ability to feel pain and sense discomfort, noting that he observed facial grimacing while inserting an intra-venous (hereinafter "I.V.") line into K.I.'s hand.
Dr. Hornstein detailed the various resuscitation techniques likely to be employed should K.I.'s condition result in cardiac arrest or respiratory failure. If K.I.'s heart stopped beating, Cardiopulmonary Resuscitation ("CPR") would be performed. This procedure involves manual chest compressions by placing substantial pressure on the sternum to compress the heart muscle. Even if conducted flawlessly, fracturing of the ribs is likely to result, and the possibility of puncturing the lungs, spleen or liver is great. Further, resuscitation efforts generally include the placing of I.V. lines in order to introduce medication into the system. When, however, attempts at placing lines intra-venously fail, interosseous efforts are undertaken. This involves drilling a line directly into the patient's bone marrow, which in and of itself is a painful and discomforting experience. Further, if respiration ceases, intubation, or the placing of a tube into the trachea in order to pump oxygen into the lungs, is likely to be performed. Dr. Hornstein completed his testimony by stating that K.I.'s prognosis is poor, and K.I. appears unlikely to have much of a chance making gains toward improving K.I.'s quality of life. Accordingly, the doctor suggested a DNR order should be offered as an option in this case.
The Court heard testimony from three additional expert witnesses  Dr. Noreen Crain, a fellow in the Critical Care Unit at Children's Hospital, Reverend Jeanne Brienneis, director of a northern Virginia hospice and expert in the field of bioethics, and Dr. Tomas Jose Silber, a physician at Children's Hospital and chairman of the hospital's office of ethics. All three experts agreed that based on the facts and circumstances of the instant matter, and upon weighing the burdens of aggressive resuscitation efforts against the benefits of prolonged life for K.I., the Court should order a DNR directive entered into respondent's medical charts. As offered poignantly by Dr. Silber, since K.I. has no understanding, and never will, of the benevolent intent behind resuscitation efforts and why pain is being administered, aggressive efforts to revive K.I. would amount to "therapeutic torture." Moreover, D.M., a putative father, agreed with the experts that a DNR order should issue from the Court. According to him, all K.I. does is "lay there and shake."
Ms. B.I., respondent's mother, opposed the DNR order.[7] The mother expressed her desire for doctors to use all efforts available to revive K.I. should K.I. encounter cardiac arrest or respiratory failure. Ms. B.I. did not, however, want CPR performed on K.I., based on the testimony presented by earlier experts that such procedure is likely to be painful and could result in fractured ribs. Ms. B.I. was in favor of doctors performing all other techniques, including intubation, defibrillation (shock with electric paddles), and interosseous efforts at introducing medication into K.I.'s system. Such wishes are not easily reconciled and cause the Court to question Ms. B.I.'s ability to understand the nature of K.I.'s plight as well as her comprehension of the testimony elicited at the hearing. When questioned regarding her expectations of K.I.'s future quality of life, Ms. B.I. testified, "I know K.I. can make it . . . It only matters if K.I. is *460 breathing . . . There's a whole lot of them [like K.I.] out there." When cross-examined by the medical guardian ad litem regarding the benefits to burdens notion proffered by the testifying experts, Ms. B.I. maintained, "any amount of pain is worth it as long as K.I. breathes." The mother's opposition to the issuance of the DNR order raises the central issue in this case.

II
The principal question is whether this Court, having acquired jurisdiction over a child determined to be neglected, may issue a DNR order over the objection of the respondent's biological mother. This question seems to be one of first impression in this jurisdiction.[8] Courts in other jurisdictions have determined closely related issues, such as the power of the court to issue a DNR order in the case of a neglected child whose parents were either unavailable to consent to such treatment or were unopposed to its issuance. Courts in other jurisdictions have also determined their ability to direct the issuance of a DNR order over the objection of loving and caring parents. However, it appears that opinions from other jurisdictions provide little guidance on the exact issue presented by this case.
Generally, when deciding whether to issue a DNR order in the case of a young child, the wishes of the natural parents are controlling. If the parents believe such an order should be entered affecting their child's medical care, and such action is consistent with medical advice, doctors follow the parental instruction. In such an instance, the need for judicial intervention is most often unnecessary.[9] When, however, the young patient has been found by the court to have been neglected by his or her parents, the situation is complicated, and the direction provided by the parents, if any, may not be in the best interests of the child. In such a situation, resort to the judiciary is appropriate.
The rule is well established that a patient has the right to refuse medical treatment, including life-sustaining measures. See Tune v. Walter Reed Army Medical Hospital, 602 F.Supp. 1452 (D.D.C.1985); In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), cert denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). Included within this notion is the right to determine for one-self what resuscitation efforts, if any, are to be performed should heartbeat and/or respiration cease. These rights are not lost merely because a patient is incompetent. Quinlan, 355 A.2d at 664; See also In re Conroy, 98 N.J. 321, 486 A.2d 1209, 1229 (1985)(stating that individuals, such as infants, mentally retarded people, and permanently comatose persons, retain their right to self-determination even though they are unable to speak for themselves on life-and-death issues concerning their medical care). When determining whether to forego extraordinary resuscitation efforts in the case of an infant, incompetent by her tender years, the decision is rightfully exercised by the child's parents or legal guardian, as the law recognizes that "natural bonds of affection lead parents to act in the best interests of their children." Parham v. J.R., 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)(Stewart, J., concurring); see also In re L.H.R., 253 Ga. 439, 321 S.E.2d 716, 722 (1984).
Situations may arise, however, in which the decision whether to implement aggressive resuscitation efforts on an infant must be answered, and no parent or guardian is *461 available to make such a determination, as may be the case where a child has been found neglected. In such cases, it is clear that the court must step forward and assume the role of parens patriae, taking responsibility for the respondent's course of treatment. Courts in other jurisdictions have interpreted this mandate to encompass the authority to direct the treating physicians of a child committed to the state through neglect proceedings to enter a DNR order into her medical records "so that if cardiac and/or respiratory arrest occurs, no heroic medical life-prolonging treatment [will] be administered." Custody of a Minor, 385 Mass. 697, 434 N.E.2d 601 (1982)(holding that once a child is found neglected and committed to the Department of Social Services, the court has the authority to make medical care decisions, including the issuance of a DNR order); see also In re C.A., 236 Ill.App.3d 594, 177 Ill.Dec. 797, 603 N.E.2d 1171 (1992)(holding that an infant's court-appointed guardian could consent to the placement of a DNR order on the child's medical charts);[10]In re Conroy, 486 A.2d at 1231 (stating that the state's power as parens patriae "permits the state to authorize guardians to withhold or withdraw life-sustaining treatment from an incompetent patient if it is manifest that such action would further the patient's best interests"). But see In re Infant C, 37 Va. Cir. 351, 1995 WL 1058596 (Va.1995)(the Circuit Court of the City of Richmond holding that it lacked the authority to consent to life-saving medical treatment being withheld from a neglected infant). The issue of the power of the court to order a DNR directive is complicated where, as in the instant case, the parents or legal guardian of a child, found by the court to be neglected, oppose such measure. Under limited circumstances, however, the state's power as parens patriae may authorize the court to issue a DNR directive despite parental objection.
"The court's role as parens patriae in neglect proceedings is well established in this jurisdiction." In re J.J.Z., 630 A.2d 186, 193 (D.C.1993)(holding that where the government seeks to dismiss [a neglect petition] over the objection of the guardian ad litem for reasons other than a lack of proof of neglect, the court must make an appropriate inquiry to determine whether the best interests of the child will be served by dismissal). Acting as parens patriae, the court has the power to "provide the relief necessary to protect the bests interests of the child." Id. This power is laid forth with particularity in D.C.Code § 16-2320 which permits the court to make such "disposition as is not prohibited by law and as [the court] deems to be in the best interest of the child." Id.; see also In re T.R.J., 661 A.2d 1086 (D.C.1995)(discussing application of D.C.Code § 16-2320). The focus of the court in determining a respondent's best interests should revolve around "plans for the provision of social, medical, and other services directed toward alleviating conditions harmful to the child." In re X.B., 637 A.2d 1144, 1147 (D.C.1994). Further, application of the "best interests" standard requires the court, "recognizing human *462 frailty and man's limitations with respect to forecasting the future course of human events, to make an informed and rational judgment, free of bias and favor, as to the least detrimental of the available alternatives." In re J.S.R., 374 A.2d 860, 863 (D.C.1977). In doing so, "the state has a substantial range of authority to protect the welfare of a child." Id. (citing Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944)). Such authority, therefore, may extend to supersede the direction of the parent or guardian of a child found by the court to be neglected, even in the context of life or death decisions.
The Court recognizes that the parents of a neglected child retain various residual parental rights over the respondent, D.C.Code § 16-2301(22), and that even in the context of neglect proceedings, parental opposition to the issuance of a DNR order must be paid tremendous heed. Yet under certain circumstances, the state may restrict a parent's control over their child. In re Madyun Fetus, 114 Wash. L. Rptr. 2233, 2239 (D.C.Super.Ct. Oct. 29, 1986); see also In re L.H.R., 321 S.E.2d at 722 (stating that when a child has been neglected or abused by her parents, their right to determine the infant's treatment may be lost). This power clearly encompasses the ability of the court to order medical treatment of a child over parental objection. Id.; see also In re Adam L., 111 Wash. L. Rptr. 25 (D.C.Super. Ct. Jan. 6, 1983)(court ordering a heart operation on a two year old child over parental objection); In re B.B.H., 111 Wash. L. Rptr. 1929 (D.C.Super.Ct. Oct. 6, 1983)(holding that the first amendment rights of parents to practice their religion does not prevent the court from authorizing a blood transfusion of an infant to preserve the baby's life). These cases, however, leave unclear the court's ability to refuse treatment on behalf of a child over parental objection. Clearly, it is one thing to order the provision of essential medical treatment in the hopes of prolonging life, and yet another to refuse treatment which may result in the termination of life.
The decision to withhold treatment, particularly in the context of resuscitation attempts, may allow for the death of the child  the ultimate termination of the parent-child relationship. Instructive in this regard is the law which has developed in this jurisdiction in the area of parental consent to adoptions. In In re J.S.R., supra, the court granted a petition for adoption over the objection of the respondent's natural mother. Id. at 864. In so doing, it was established that "the right that a parent has to the custody and rearing of his children is not an absolute one, but one that may be forfeited by abandonment, unfitness of the parent, or where some exceptional circumstances render the parent's custody of the child detrimental to the best interests of the child." Id. (quoting Winter v. Director, Department of Welfare, 217 Md. 391, 143 A.2d 81 (1958)). The D.C. Court of Appeals held, in In re J.S.R., that a foster parent's petition for adoption could be granted over parental objection where it is shown, by clear and convincing evidence, that parental consent was being withheld contrary to the respondent's best interests. Id. Similarly, this Court believes that when parental consent to the issuance of a DNR order is unreasonably withheld contrary to a respondent's best interests, the court's powers as parens patriae provide the authority to order medical personnel to forego extraordinary medical life-prolonging procedures.
In In re Tabatha R., 252 Neb. 687, 564 N.W.2d 598 (1997), the Supreme Court of Nebraska dealt with circumstances similar to those which exist in the instant matter before the Court. In that case, the infant respondent was diagnosed shortly after birth as suffering from respiratory syncytial viral disease. The condition required the use of a mechanical ventilator to assist the child in breathing. The juvenile court found that the child came within its jurisdiction upon a finding of abuse and neglect. *463 Id. at 691. Further, the state Department of Social Services "filed with the juvenile court a so-called `Notification of Informed Consent,' which advised the parents that it intended to direct [the hospital]. . . not to resuscitate" the respondent. Id. The trial court found, by clear and convincing evidence, respondent's best interests would be served by assenting to the Department's determination that a DNR order should issue. Id. The State Supreme Court, upon review of the trial court's decision, agreed that there may be occasions where the court has the authority to consent to a DNR directive over parental objection. The court held, however, that the issuance of a DNR order was tantamount to a termination of parental rights, and as such, "the same due process must be afforded in a[DNR] hearing as is required in a proceeding to terminate parental rights." Id. at 696. Accordingly, the State Supreme Court reversed and remanded the case for further hearings on the issue. Id. at 697; see also In re Baby K, 832 F.Supp. 1022, 1031 (E.D.Va.1993)(the court, in a non-neglect case, while denying a hospital's request to issue a DNR order over the objection of a caring parent, opined that there may well exist situations where a DNR could be ordered over parental objection, but before such action could be taken, "[a]t the very least, the hospital must establish by clear and convincing evidence that [the mother's] treatment decision should not be respected because it would constitute abuse or neglect of the respondent").
Based on the law set forth above, this Court is confident that where a respondent has been found neglected, and that child's parent takes a position clearly beyond her best interests, or displays judgment which is contrary to all competent medical evidence, the court need not monitor the situation idly and give effect to the parent's injudicious course of treatment. See Barry, 445 So.2d at 371; In re L.H.R., 321 S.E.2d at 722. Under such circumstances, this Court must act in the respondent's best interests regardless of the contrary direction provided by the child's parents or guardians. Accordingly, this Court finds that after an adjudication of neglect, and upon a showing both that it is in a respondent's best interests to forego aggressive efforts towards resuscitation in the event of cardiac or respiratory arrest, and that the biological parents or legal guardians have unreasonably withheld their consent to the issuance of a DNR order, it is permissible to issue such an order over parental objection.
The Court next considers both the evidentiary and the substantive standards that would support the issuance of a DNR order under these limited circumstances.

IV
The evidentiary standard generally applied in neglect proceedings is the preponderance of the evidence, which requires the "court to merely determine who has the most competent evidence." In re J.S.R., 374 A.2d 860 (D.C.1977). Courts have, however, on occasion, seen fit to apply the heightened test of clear and convincing evidence to issues in the context of abuse and neglect matters. See In re J.S.R., 374 A.2d at 864 (requiring foster parents to prove that parental consent to adoption is being withheld contrary to the child's best interests by clear and convincing evidence); In re T.J., 666 A.2d 1 (D.C.1995)(upholding mentally ill parent's choice of a fit custodian for her child unless it can be demonstrated by clear and convincing evidence that such placement is against the respondent's best interests). The clear and convincing standard is necessary when dealing with issues having "far-reaching effects on individuals," or where the consequences of a court's decision will be severe. In re J.S.R., 374 A.2d at 864. See generally Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)(holding that the clear and convincing standard is constitutionally adequate for a finding of involuntary commitment). *464 In consideration of the impact that a DNR directive may have on the life of the respondent in the instant matter, as well as of the imposition of such an order on the ability of respondent's mother to control K.I.'s medical treatment, the Court finds that the clear and convincing evidence standard must be applied to all essential elements of the Court's ruling hereto. Accordingly, the issuance of a DNR order must be predicated upon a finding by clear and convincing evidence both that it is in K.I.'s best interests to forego aggressive revival measures, and that Ms. B.I.'s refusal to consent to the issuance of the DNR order is unreasonably contrary to K.I.'s well-being. See Cruzan v. Missouri Department of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)(holding state requirement that incompetent's wishes as to withdrawal of life-sustaining treatment be proved by clear and convincing evidence consistent with due process); In re C.A., 177 Ill.Dec. 797, 603 N.E.2d at 1181 (applying clear and convincing standard to the medical evidence and opinions regarding the minor respondent's prognosis before allowing a DNR to issue); In re James Barry, 445 So.2d at 371 (requiring a finding by clear and convincing evidence that removal of respondent's life support was in his best interests). In addition to determining which is the applicable standard of evidence in this matter, the question remains whether to apply a substituted judgement or a best interests analysis.
In response to the medical guardian ad litem's request for a DNR order, several counsel in the instant matter argued that the issuance of such an order must be premised upon application of the substituted judgement test. Under that test, when a "once competent patient . . . is unable to render an informed decision . . . the court must make a substituted judgement on behalf of the patient, based on all the evidence." In re A.C., 573 A.2d 1235, 1249 (D.C.1990)(emphasis added). In so doing, the court must "determine as best it can what choice [the] individual, if competent, would make with respect to medical procedures,. . . acting upon the same motives and considerations as would have moved [the patient]." Id. Several courts from various jurisdictions around the country have indeed applied the substituted judgement standard in cases factually similar to the instant matter. See, e.g., In re Barry, 445 So.2d at 370-71 (applying the substituted judgement test even in absence of evidence of the minor's intent, stating that the court must be guided primarily by the judgement of the child's parents); Custody of a Minor, 434 N.E.2d at 608; Care and Protection of Beth, 412 Mass. 188, 587 N.E.2d 1377 (1992).[11] This Court, however, disagrees that the substituted judgement test should govern the determination currently under consideration, and instead, opts to adopt the "best interests" analysis in cases involving minor respondents who have lacked, and will forever lack, the ability to express a preference regarding their course of medical treatment.
In deciding to apply the "best interests" standard to the case at hand, the Court notes that a trial court cannot "be bound to apply the substituted judgement test when almost by definition, an infant has no articulable judgement to be substituted." In re C.A., 177 Ill.Dec. 797, 603 N.E.2d at *465 1180. "Generally, the application of substituted judgement necessitates that the patient had been competent at one time and had in some manner expressed her preferences or values concerning life-sustaining treatment." Karen H. Rothenberg, Foregoing Life-Sustaining Treatment: What are the Legal Limits in an Aging Society?, 33 St. Louis U. L.J. 575 (1989). The best interests standard, in contrast, allows a guardian or court to objectively weigh the benefits and burdens of a proposed course of action to determine "how a reasonable person in the patient's circumstances would promote her well being." Id. Therefore, this Court finds that the best interests doctrine is the appropriate standard to apply when deciding whether to forego life sustaining treatment in the case of a neglected infant whose parents' decision not to forego resuscitation efforts is contrary to the child's well-being. See In re T.R.J., 661 A.2d at 1092 (stating that the best interests standard is consistent with the statutory framework of the District's neglect statute); In re C.A., 177 Ill.Dec. 797, 603 N.E.2d at 1180 (rejecting substituted judgment doctrine in favor of best interests test when dealing with the medical decisions of a neglected infant); Rasmussen v. Fleming, 154 Ariz. 207, 741 P.2d 674 (1987)(stating that in cases where the incompetent patient has never expressed medical desires, decisions concerning the patient's medical treatment are to be guided by the "best interests" standard).

V
Courts from various jurisdictions have attempted to set forth the factors to be considered in conducting a "best interests" analysis in the context of determining the forbearance or withdrawal of life-sustaining procedures in the case of an incompetent person. The cases make clear the framework for the inquiry must revolve around balancing the burdens of continued life against the benefits and rewards of furthering life. In re Beth Israel Medical Center, 136 Misc.2d 931, 519 N.Y.S.2d 511, 516 (N.Y.Sup.Ct.1987); see also In re Conroy, 486 A.2d at 1232 (requiring, in addition to the benefits versus burdens balancing test, "an additional showing that to prolong life would be inhumane"). In In re Beth Israel Medical Center, supra, the Supreme Court of New York listed numerous considerations to guide the court's inquiry; the relevant factors included: (1) the age of the patient; (2) the degree of present and future pain and suffering with or without the procedure; (3) the life expectancy with or without the contemplated measures; (4) the quality of the patient's life with or without the procedure, including the extent, if any, of pleasure, emotional enjoyment, or intellectual satisfaction that the patient will obtain from prolonged life; (4) the degree of invasiveness of the procedure, and the possible adverse effects; (5) the views of those close to the infant; and (6) the views and opinions of the physicians and other professionals involved in the case. Id. at 517; see also Rasmussen v. Fleming, 741 P.2d at 689 (stating that under the best interests analysis, the court must consider objective factors such as relief from suffering, the quality and extent of sustained life, satisfaction of present and future desires, and the possibility of regaining the capacity for self-determination). The above listed factors are helpful in evaluating whether K.I.'s predicament dictates K.I.'s best interests lie in having K.I.'s physicians limit treatment pursuant to a DNR order.
Consideration of K.I.'s future medical treatment must begin by noting that prior to the commencement of the DNR hearing held in this matter, K.I.'s guardian ad litem, charged statutorily with the duty to safeguard K.I.'s best interests, D.C.Code § 16-2304(b) (3), K.I.'s medical guardian ad litem, appointed by this Court to advocate in K.I.'s best interests regarding medical care, and Mr. D.M., one of K.I.'s putative fathers, all concurred that a DNR order should be issued in this case. Significant in the Court's view is that these *466 individuals have become quite familiar with young K.I. and K.I.'s current situation, and have K.I.'s welfare at heart. Moreover, based on the testimony elicited from the witnesses, outlined previously herein, this Court is convinced that K.I. is neurologically devastated and will never regain normal cognitive functioning. K.I. is incapable of responding to external stimuli; K.I. is unable to react to K.I.'s environment or comprehend events taking place around K.I. Further, K.I. cannot sense pleasure, nor give or receive love or affection. Witnesses testified that respondent's condition is unlikely to improve. Accordingly, it is apparent that K.I.'s future existence will be devoid of any meaningful quality or satisfaction.
K.I.'s unenviable situation is compounded by the fact that, despite K.I.'s inability to draw pleasure or satisfaction from K.I.'s existence, K.I. is capable of sensing pain and discomfort. This is significant in light of the fact that many of the medical procedures currently being administered to K.I., as well as those which would be employed in the event of aggressive resuscitation, are painful. During the September 4th hearing, the evidence made clear that many of the techniques which would be utilized in the event of a cardiac arrest or respiratory failure would be highly invasive, including the use of electric shocks, manual chest compressions capable of fracturing bones and/or puncturing major organs, and surgical procedures such as inserting a tracheal tube or drilling medication lines directly into the bone marrow. Additionally, K.I.'s current treatment continues to necessitate the use of I.V. lines to administer medication and this presents a source of discomfort. It is clear that enduring the pains associated with aggressive resuscitation would constitute a high price to pay considering the life into which K.I. would be brought back.[12] Furthermore, even if aggressive resuscitation measures are undertaken in the event of a medical crisis, such procedures are unlikely to be successful in prolonging K.I.'s life. Moreover, even if revived, K.I. would most probably emerge from the experience with more extensive neurological damage than at present. Finally, the Court notes that all five expert witnesses opined that the issuance of a DNR order would be in K.I.'s best interests. Accordingly, the Court is satisfied, by clear and convincing evidence, that upon balancing the burdens of continued life against the benefits and rewards of furthering life, K.I.'s best interests will be served by issuing a DNR order.

VI
K.I.'s mother disagrees with the experts and refuses to consent to the issuance of a DNR directive.
This Court, during the fact finding hearing held on August 26, 1998, found that Ms. B.I. had neglected K.I., based in part on evidence that she had refused to cooperate with hospital staff regarding K.I.'s medical needs, had removed K.I. from her apnea and oxygen monitors, and had terminated K.I.'s tube feeding procedure. Additionally, when K.I. was initially removed from B.I.'s custody, K.I. was found to be suffering from a high fever and in respiratory distress; yet at the time, Ms. B.I. was taking no measures to secure appropriate medical attention.
Since K.I.'s current period of hospitalization, the mother's participation in K.I.'s life has been sporadic. Social workers involved in the case have reported that Ms. B.I. has been absent from critical meetings with medical personnel regarding important treatment decisions, and has appeared to be in a "compromised mental state" during several visitations with K.I. and meetings with hospital staff. Ms. B.I.'s pattern of behavior is troubling in that it reflects an inability on her part to make decisions which foster K.I.'s best interests.
*467 The Court's hesitation in allowing Ms. B.I. control over K.I.'s health care decisions is amplified in light of her statements before the Court during the September 4, 1998, DNR hearing. Upon being questioned by her counsel regarding her expectations as to K.I.'s future quality of life, Ms. B.I. stated, "it only matters if K.I. is breathing." Later, when cross-examined by the medical guardian ad litem regarding the benefits to burdens analysis discussed herein, Ms. B.I. opined, "any amount of pain is worth it as long as [K.I.] breathes." When asked whether her desire to have K.I. revived at all costs was for her benefit or for K.I.'s, Ms. B.I. stated, "for both of us." Ms. B.I. appeared to the Court unable to rationally articulate any reason why it would be in K.I.'s interests to be resuscitated in the event of a cardiac arrest or respiratory failure. To the contrary, despite hearing the opinions of the experts who testified prior to her, Ms. B.I. simply repeated to the Court that she wants K.I. kept alive no matter what. While it may be the mother's prerogative to oppose the issuance of a DNR order, the weight of the evidence dictates to the contrary, and the Court is not convinced the mother's decision advances K.I.'s best interests.
This Court finds, after consideration of the expert testimony adduced during the September 4th hearing in support of the issuance of a DNR order, as well as Ms. B.I.'s sporadic history of attending to K.I.'s medical needs, and her statements made to this Court regarding her desire to keep K.I. alive at all costs, that Ms. B.I.'s refusal to consent to the entry of a Do Not Resuscitate order is both unreasonable and contrary to K.I.'s best interests.
Accordingly, it is this 16th day of October, 1998, hereby
ORDERED, that the request of the medical guardian ad litem that this Court issue a Do Not Resuscitate order is GRANTED; and it is
FURTHER ORDERED, that the medical treatment of the respondent, K.I., shall be limited in accordance with the guidelines prescribed in the separate Order Regarding Resuscitation, also issued by the Court on this 16th day of October, 1998; and it is
FURTHER ORDERED, that if the medical condition of K.I. and/or the circumstances surrounding this case change, such that respondent's physicians and/or parties hereto believe this Order or the separate Order Regarding Resuscitation, dated October 16, 1998, need be modified, said individuals may request reconsideration by this Court.
Hon. Rafael Diaz
Judge, D.C. Superior Court
NOTES
[1] D.M. has not submitted to a paternity test, but during his testimony at the DNR hearing, he claimed to be K.I.'s father. Another putative father was C.R. The results of genetic testing for paternity confirm that C.R. is not the biological father of K.I. His counsel filed a statement indicating that "Mr. C.R. has no interest in the outcome of these appeals."
[2] After the August 26, 1998 hearing on the neglect petition, at which B.I. failed to appear, the trial court based its findings and conclusions on the testimony of Mr. Lahai and D.M. The court found a "connection between [B.I.'s] drinking and her failure to provide care to [K.I.] under [§ 16-2301(9)(B)]." The court also concluded that "under [§ 16-2301(9)(C), B.I. was] unable to discharge her responsibilities to [K.I.]" because she "[took] the child off the machines . . . [and] placed the child at risk . . . ." Further, said the court, under § 16-2301(9)(F), K.I. received "negative treatment or maltreatment . . . ." Therefore, K.I. was found to be a neglected child under § 16-2301(9)(B), (C), and (F).
[3] The medical guardian ad litem also discusses the trial court's power to appoint such a guardian, and the powers of the guardian ad litem. In its memorandum in lieu of brief, the District asserts that these matters were not raised in the trial court and should not be considered on appeal. We agree. See Miller v. Avirom, 127 U.S.App. D.C. 367, 369-70, 384 F.2d 319, 321-22 (1967) ("Questions not properly raised and preserved during the proceedings under examination . . . will normally be spurned on appeal.").
[4] The District of Columbia took no position on the issuance of the DNR.
[5] B.I. did not favor the use of CPR because of medical testimony that it might fracture K.I.'s ribs and probably would be painful.
[6] We do not address D.M.'s complaint about the failure of the trial court to recognize his alleged right to parental privacy and autonomy. Our review of the record on appeal reveals that D.M. did not assert this alleged right in the trial court. Significantly, however, no parental rights to which D.M. may be entitled have been terminated, and he is free to assert those rights in any future proceeding in the trial court.
[1] Ms. B.I., the mother, was absent from the fact-finding hearing held August 26, 1998.
[2] Paternity tests were ordered for both putative fathers. However, as of the date of this Order, the results of said tests have not been submitted to the Court.
[3] The government took no position on the issuance of the DNR order.
[4] Dr. Hauser testified that he stepped down from the position as bioethics chairman four days prior to the court hearing.
[5] Upon inquiry of the Court, Dr. Hauser described K.I.'s medical ailments to include chronic lung disease, failure to thrive, hydrocephalus (water inside the head), cerebral palsy, sickle cell anemia, and gastro-esophageal reflux.
[6] According to Dr. Hauser, K.I. is not in a "persistent vegetative state." To be in such state, a patient must be completely unresponsive to her surroundings (including possessing an inability to feel pain), and must remain so for a minimum of six months.
[7] Mr. C.R., K.I.'s other putative father, stated his position was identical to the mother's.
[8] Neither the medical guardian ad litem, nor other parties were able to provide this Court with authority to issue a DNR order under the specific factual circumstances presented by this case; nor did the Court's research yield such authority
[9] See In re Jane Doe, 262 Ga. 389, 418 S.E.2d 3 (1992)(stating that medical decision-making for incompetent patients is most often best left to the patient's family and the medical community, and that courts remain available to decide controversial cases).
[10] The respondent in In re C.A. was born premature, requiring the use of an apnea monitor as well as mechanical ventilation. In re C.A., 177 Ill.Dec. 797, 603 N.E.2d at 1172. Through neglect proceedings, the juvenile court found that respondent's parents were unwilling and unable to care for her and that it was in her best interests to be made a ward of the court. Id. 177 Ill.Dec. 797, 603 N.E.2d at 1173. When respondent's medical condition worsened, the hospital in which she was placed sought a DNR order. A hearing was held on the issue, and testimony was elicited from several physicians, each of whom testified that respondent would never improve to lead a normal life and that it would not be in her best interests to be resuscitated if her heart stopped beating or she ceased breathing. Id. 177 Ill.Dec. 797, 603 N.E.2d at 1178. Further, it should be noted that respondent's parents both consented in writing to the issuance of the DNR order. Based on the medical evidence presented, the court concluded that its consent to a DNR order was proper under the circumstances. Id.
[11] The Massachusetts courts, while applying the substituted judgment doctrine in cases involving minors never able to discuss or express their intent, have found the substituted judgment analysis consistent with the best interests standard. See Care and Protection of Beth, 587 N.E.2d at 1381. In that case the court stated:

[I]t is true that, when applying the best interests test, the inquiry is essentially objective in nature, and the decisions are made not by, but on behalf of, the child. Nevertheless, the best interests analysis, like that of the substituted judgement doctrine, requires a court to focus on the various factors unique to the situation of the individual for whom it must act . . . As a practical matter, the criteria to be examined and the basic applicable reasoning are the same. Id. at n. 11.
[12] One witness, after considering K.I.'s current and future prognosis, testified that aggressive resuscitation efforts would amount to "therapeutic torture."