In re Eleanor V. WALKER, Appellant

In re Eleanor V. Walker

Commission On Mental Health Services, Appellant

Nos. 97–FM–734, 98–FM–1908.

District of Columbia Court of Appeals.

Argued Nov. 2, 1999.
Decided July 29, 2004.

---

Jaclyn S. Frankfurt and Laurie B. Davis, Public Defender Service, with whom James Klein, Harry J. Fulton, and Samia Fam, Public Defender Service, were on the briefs, for Eleanor Walker.

Janet L. Maher, Deputy Corporation Counsel, with whom John M. Ferren, Corporation Counsel at the time the brief in No. 97–FM–734 was filed, Jo Anne Robinson, Interim Corporation Counsel at the time the brief in No. 98–FM–1908 was filed, Charles L. Reischel, Deputy Corporation Counsel at the time the briefs were filed, and Diane G. Lucas and Michelle Conner, Assistant Corporation Counsel, were on the briefs, for the Commission on Mental Health Services.

Before TERRY, SCHWELB, and GLICKMAN, Associate Judges.

PER CURIAM:

These consolidated appeals both involve Eleanor Walker, who was committed to

Saint Elizabeths Hospital as an outpatient under the Ervin Act, D.C.Code §§ 21–501 *et seq.* (2001),[1] after her treating psychiatrist sought her involuntary hospitalization. Following a mental health examination, the Commission on Mental Health Services ("CMHS") filed a petition to revoke her outpatient commitment so that she could be recommitted as an inpatient. While that petition was pending, a physician at Saint Elizabeths ordered that Ms. Walker receive involuntary injections of Haldol Decanoate. Thereafter the trial court denied CMHS's petition, and Ms. Walker was released. In the first appeal, Ms. Walker challenges the trial court's denial of her post-release "Motion for Appropriate Relief," asserting that the hospital violated her due process rights by forcibly injecting her without following the appropriate procedures for involuntary medication as set forth in a document known as CMHS Policy 50000.430.2B.

In the second appeal, CMHS challenges the trial court's denial of its application, pursuant to D.C.Code § 21–592, for an order directing the United States Marshals Service to detain Ms. Walker and return her to Saint Elizabeths Hospital. In ruling as it did, the court held that section 21–592 applied only to patients who have escaped from the hospital or to those who have failed to return as directed, and that neither category included Ms. Walker. On appeal, CMHS argues that the statute is ambiguous and urges this court to apply section 21–592 to all patients.

We reverse in Ms. Walker's appeal and affirm in CMHS's appeal.

## I. FACTUAL BACKGROUND

Ms. Walker has a long history of mental illness. In April 1991, Officer David Wil-

hight of the Metropolitan Police responded to a call from the Mount Carmel Shelter for Women. When the officer arrived at the shelter, he found Eleanor Walker "tearing up papers, yelling obscenities about killing herself and [others] ...." The officer brought her to Saint Elizabeths Hospital, where she was examined by a psychiatrist on duty. The psychiatrist concluded that Ms. Walker was mentally ill, suffering from "schizophrenia, paranoid, chronic with acute exacerbation," and that she was likely to injure herself or others if allowed to remain at liberty. Accordingly, pursuant to D.C.Code § 21–523, the court entered an order authorizing Ms. Walker's emergency hospitalization for a period not to exceed seven days.

At the time of her admission to the hospital, Ms. Walker's symptoms included suspiciousness, anxiety, threats to kill herself, auditory hallucinations, and the belief that she was being poisoned by the government. At a hearing requested by Ms. Walker, the court found that CMHS had established probable cause to believe that she was mentally ill and, because of that illness, was likely to injure herself or others unless immediately hospitalized. Before the seven-day emergency commitment expired, CMHS filed a petition for judicial hospitalization seeking inpatient commitment. After a trial on the petition, *see* D.C.Code § 21–545, a jury found by clear and convincing evidence that Ms. Walker was mentally ill, but the court committed her to the hospital only for outpatient treatment. The commitment order provided that Ms. Walker would be released from Saint Elizabeths but directed her to participate in a treatment program at a

---

1. The "Ervin Act" is the popular name of the District of Columbia Hospitalization of the Mentally Ill Act, Pub.L. No. 88–597, 78 Stat. 944 (1964), *revised and re-enacted,* Pub.L. No. 89–183, 79 Stat. 685, 750 (1965), as amended from time to time thereafter. The name comes from its principal sponsor, the late Senator Sam J. Ervin, Jr., of North Carolina.

community mental health center and to take prescribed medication.

Ms. Walker received treatment over the next five years with no apparent complications. On December 18, 1996, however, Ms. Walker was involuntarily admitted to Saint Elizabeths pursuant to Super. Ct. Mental Health Rule 16 in a proceeding initiated by Dr. Shakuntala Dhir, her treating psychiatrist at North Community Mental Health Center. Believing that her sister was trying to poison her, Ms. Walker had filled apple juice and soda bottles with bleach and placed them in the refrigerator in an attempt to poison her sister. A psychiatric examination performed the next day indicated that Ms. Walker was "irritable, suspicious, having an angry mood, defensive and derealization [sic]." It was also discovered that Ms. Walker had not been taking her medication. Acting on these observations, CMHS filed a petition to revoke her outpatient commitment and to commit her instead as an inpatient. Counsel was appointed for Ms. Walker, and a hearing on the petition was scheduled.

While the petition was pending, Ms. Walker remained at Saint Elizabeths Hospital. On December 27, 1996, Altephenos Boone, a patient advocate at Saint Elizabeths, spoke to Ms. Walker about a request from someone at the hospital (unidentified in the record) "to initiate involuntary medication procedures." Haldol had been prescribed for treatment of her symptoms "associated with schizophrenia," but according to her treatment team, Ms. Walker had refused since her arrival on December 18 to take any neuroleptic medication other than Prozac. It

was Mr. Boone's job to explain the contemplated procedure to her and to try to resolve any conflict over the medication. Ms. Walker told him that she was refusing to take it because "she was not mentally ill and [therefore] she should not be here." She also remarked that Dr. Dhir "was harassing her."

Mr. Boone informed Dr. Robert Keisling, Acting Medical Director of the Acute Psychiatric Unit at Saint Elizabeths, of Ms. Walker's refusal to take her prescribed medication. Thereafter, on January 7, 1997, after examining Ms. Walker and reviewing her medical records, Dr. Keisling ordered that she receive involuntary injections of Haldol Decanoate for a sixty-day period.[2] Over the next several days Ms. Walker was twice forcibly medicated by the hospital staff. Then, on January 16, after a two-day hearing, the court dismissed CMHS's petition to revoke her outpatient commitment. Ms. Walker was thereupon released from the hospital.

A few weeks after her release, Ms. Walker filed with the court a "Motion for Appropriate Relief." In that motion, Ms. Walker claimed that the hospital had forcibly injected her without following the appropriate procedures for involuntary medication outlined in CMHS Policy 50000.430.2B and thus had violated her "constitutional right to privacy as well as her right to procedural due process." Specifically, Ms. Walker alleged that the hospital had failed to obtain a proper request for involuntary medication from her treating physician, nor had it informed her of her right to have the decision reviewed by the CMHS Medical Director. To remedy these asserted violations of her rights,

---

**2.** Haldol Decanoate is a long-lasting neuroleptic medication which is administered by intramuscular injection. Dr. Keisling stated in his affidavit that, before ordering the medication, he reviewed "Dr. Dhir's Rule 16 affidavit, two psychiatric assessments and several notes regarding the issue of medication from both Dr. Alan Schwartz, the ward's attending psychiatrist, and Dr. Nguyen, the ward's resident psychiatrist."

Ms. Walker asked the court to rescind Dr. Keisling's order for involuntarily medication, to direct the hospital to correct the medical records to reflect such rescission, and to require the hospital to provide her with a written explanation of her right to refuse medication. CMHS filed an opposition, arguing that the issues raised by Ms. Walker were moot and that, in any event, she had been medicated in accordance with applicable CMHS policies while in the hospital.

The trial court denied Ms. Walker's motion, concluding that the hospital had followed the appropriate procedures. In its order the court stated:

> [T]he commission has provided the Court with a copy of the hospital's progress notes for the pertinent time frame during which Respondent was hospitalized. These notes evidence that Respondent's attending psychiatrist, Dr. Andrew Schwartz, interviewed Respondent "at some length" on December 20, 1996, and then initiated involuntary medication procedures on December 24, 1996 in accordance with CMHS Policy 50000.430.2B6.... The progress notes additionally indicate that on December 27, 1996, Mr. Altephenos Boone, a patient rights advocate, consulted with Respondent.... Although the notation does not specify the content of this consultation, the Commission has provided an affidavit from Mr. Boone, who affirms that he informed Respondent of all her rights pursuant to the Commission's policy.
>
> ... Because Mr. Boone could not resolve the problem, he notified the Acting Medical Director of the Acute Psychiatric Hospital, Robert Keisling, of the results of the consultation and immediately noted the meeting in Respondent's medical record.... Dr. Keisling, in turn, conducted an independent evaluation of

Respondent on January 7, 1997, found that Respondent was unable to make an informed decision regarding her medication due to mental illness, and ordered that she receive involuntary injections of Haldol for 60 days.

> ＊　　＊　　＊　　＊　　＊　　＊

> Upon review of the affidavits and medical records provided by the parties, this Court finds that the hospital followed all appropriate involuntary medication procedures as set forth in CMHS Policy 50000.430.2B6 in ordering the administration of Haldol to Respondent. Therefore, Dr. Keisling's January 7, 1997, order is valid and shall not be rescinded.

Ms. Walker then filed a motion to alter or amend the judgment under Super. Ct. Civ. R. 59(e), contending that the court had erred in finding that Dr. Schwartz initiated the involuntary medication procedure. She asserted that there was no note in her medical records indicating that her treating psychiatrist had initiated the procedure as required by the CMHS policy. In addition, she argued that "the court's acceptance of Mr. Boone's long after the fact and untested affidavit, wherein he asserts that he informed Ms. Walker of all her rights ... is an inadequate basis for the court to find that he properly discharged his important duties." CMHS filed an opposition, arguing that Civil Rule 59 was not applicable to mental health proceedings, that Mr. Boone's statements in his affidavit were supported by the hospital records, and that "there is no requirement in CMHS policy No. 50000.430.2B that the attending psychiatrist write a single clinical note containing all of the considerations leading to a request for involuntary medication." CMHS noted that its policy requires "that a treating psychiatrist provide documentation to the medical director of the clinical program that the

factors involved in the administration of involuntary medication are addressed." The court denied the motion, concluding that "Dr. Keisling [the relevant medical director] had before him all the information required under CMHS Policy 50000.430.2B to base his independent evaluation via respondent's medical records and progress notes."

Ms. Walker noted an appeal from the denial of her motion for appropriate relief and the order denying her motion to alter or amend the judgment. While that appeal was pending, Ms. Walker's mental condition began to deteriorate. According to Dr. Dhir, Ms. Walker had failed to comply with her outpatient treatment program by refusing to take her prescribed anti-psychotic medication, and as a result she had become increasingly paranoid and delusional. In addition, she had become concerned about her drinking water, which she claimed had been poisoned. Dr. Dhir and the hospital treatment team had made several efforts to engage Ms. Walker in treatment, including a visit to her home, but with no success.

Concerned that she was a danger to herself and others, CMHS filed an *ex parte* application in the trial court, pursuant to D.C.Code § 21–592, seeking an order directing the United States Marshal to detain Ms. Walker and return her to Saint Elizabeths Hospital. The application was initially granted on October 28, 1998, but on November 3 Ms. Walker's counsel filed an emergency motion for a stay, asserting that Ms. Walker had not been served with a copy of the application and thus had not had an opportunity to file a response. In addition, counsel challenged the merits of the application, stating that Ms. Walker had not left Saint Elizabeths Hospital without permission and that she denied the allegations of paranoid behavior. The

court granted the request for a stay and scheduled a hearing for November 20.

On November 16 Ms. Walker sent a letter to the trial judge asking her to postpone the hearing so that she could prepare a counterclaim. On the morning of the hearing, November 20, Ms. Walker filed a *pro se* counterclaim against Dr. Dhir, numerous government officials and agencies, and the Teledyne Water Pik Company, alleging *inter alia* that Dr. Dhir had filed the application to return her to Saint Elizabeths because of pressure from the "closet homosexual/lesbian network in this country." This same network, she explained, was responsible for contaminating the water supply in the Washington area. Following a hearing, the trial court denied the petition to return Ms. Walker to the hospital, holding that CMHS had failed to satisfy the requirements of section 21–592. CMHS noted an appeal, which we consolidated with Ms. Walker's earlier appeal.

## II. MS. WALKER'S APPEAL

■ On appeal, Ms. Walker contends, as she did in the trial court, that the involuntary administration to her of Haldol in 1997 violated the CMHS policy in several respects. Specifically, she complains that she was forcibly injected with Haldol despite the failure of the treating psychiatrist

1. to make a referral to the medical director;

2. to present the medical director with supporting documentation; and

3. to enter a clinical note in Ms. Walker's record with detailed information regarding her medical history and the reasons for the issuance of an involuntary medication order.

According to Ms. Walker, this noncompliance with the policy also deprived her of liberty interests secured by the Due Pro-

cess Clause of the Fifth Amendment. Ms. Walker further claims that the physicians at Saint Elizabeths failed to consider whether the involuntary administration of Haldol posed a risk to her health, especially in light of her prior history of adverse reactions to such medications.

In the trial court, CMHS did not challenge Ms. Walker's position that the CMHS policy created enforceable rights, but argued instead that "Respondent was medicated in accordance with [the] CMHS Policy while she was in the Hospital." On appeal, however, CMHS has abruptly changed direction and effectively has acknowledged "the Hospital's failure to follow the precise letter of the policy." In its brief CMHS concedes that

> the Bureau Medical Director was notified of the plan to medicate by the Patient Advocate and not by the treating psychiatrist, [that] the considerations required to be presented to the Bureau Medical Director were contained in a series of progress notes authored by several treating doctors rather than in a single note, and [that] the note of the Bureau Medical Director did not contain each of the considerations described in the CMHS policy.

CMHS argues, however, that "[t]he Policy here creates no legally recognized right," because, according to CMHS, the policy does not have the force of law. CMHS asserts that the procedures utilized at Saint Elizabeths are in conformity with due process, that the policy adds no enforceable protections beyond those secured to Ms. Walker by the Fifth Amendment, and that Ms. Walker is therefore entitled to no relief.

The position taken by CMHS on appeal brings a completely new issue into the case. In the trial court, the litigation centered on whether CMHS had complied with its own policy. The dispositive character of this argument was not challenged by any party. Indeed, this was the only question addressed by the trial judge. Thus, in effect, CMHS is asking us to affirm the trial judge's order on a ground—i.e., that the policy conferred no rights on Ms. Walker and is not enforceable—which is different from the ground relied upon by the judge herself. Further, the position that CMHS is urging on appeal was never presented to the trial court at all.

"The kind of barristerial about-face which characterizes [CMHS' position in] this case finds little favor in the courts." *B.J.P. v. R.W.P.*, 637 A.2d 74, 78 (D.C. 1994). As Judge Spottswood Robinson wrote so eloquently for the court in *Miller v. Avirom*, 127 U.S.App. D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967):

> In our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort. Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal. Canons of this tenor reflect, not obeisance to ritual, but considerations of fairness to the court and the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact. [Footnotes and internal quotation marks omitted.]

In the present case, the claim on which CMHS is attempting to focus the appeal, namely, that its policy is nothing more than an internal handbook or set of guidelines and is therefore not enforceable, bears no significant relation to the ques-

tion litigated and decided in the Superior Court.

To be sure, we may affirm a judgment on any valid ground, even if that ground was not relied upon by the trial judge or raised or considered in the trial court. *See, e.g., In re O.L.,* 584 A.2d 1230, 1232 (D.C.1990). Our authority to do so presupposes, however, that the appellant has suffered no procedural unfairness— that is, that she has had notice of the ground upon which affirmance is proposed, as well as an opportunity to make an appropriate factual and legal presentation with respect thereto. *Sheetz v. District of Columbia,* 629 A.2d 515, 519 n. 5 (D.C. 1993). Here, Ms. Walker had no notice in the trial court of CMHS' subsequently improvised position that the policy was not enforceable. Had she received such notice, she could have adjusted her strategy to meet this contention, and would doubtless have focused, in her preparation for trial and in her factual and legal presentation, on the status of the policy. We are therefore of the opinion that considerations of procedural fairness preclude us from affirming on the ground now being asserted by CMHS.

Moreover, though we do not decide the issue, it is less than clear that even if CMHS had asserted its current theory in timely fashion, its position would be legally sound. It is true that we have held, in a variety of factual settings, that internal policy manuals and similar documents generally do not give rise to judicially enforceable rights, for they are not statutes or regulations and have no legal force or effect. *See, e.g., Clark v. District of Columbia,* 708 A.2d 632, 636 (D.C.1997) (suicide prevention plan for juvenile detention facility); *Morgan v. District of Columbia,* 468 A.2d 1306, 1317–18 (D.C.1983) (en banc) (police department general orders). But the policy at issue here must be considered in its constitutional context. In the District of Columbia, as in all jurisdictions, the courts have long recognized and upheld "the right of every person to bodily integrity . . . ." *In re A.C.,* 573 A.2d 1235, 1243 (D.C.1990) (en banc). This right embraces "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the [Constitution]," *Washington v. Harper,* 494 U.S. 210, 221– 222, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), for "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229, 110 S.Ct. 1028 (citations omitted); *accord, Riggins v. Nevada,* 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). Thus "[t]he government cannot intrude upon [a person's] bodily integrity without a showing of overriding justification and medical appropriateness." *Khiem v. United States,* 612 A.2d 160, 165–166 (D.C.1992), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993) (citing *Riggins* ).

The policy on which Ms. Walker relies was adopted as a result of the District's recognition of its obligation to provide adequate protection for the "significant liberty interest" in avoiding the involuntary administration of antipsychotic drugs. The Supreme Court has explained that the administration of such drugs "cannot withstand challenge if there are no procedural safeguards to ensure [that] the [patient's] interests are taken into account." *Harper,* 494 U.S. at 233, 110 S.Ct. 1028; *see also Kulas v. Valdez,* 159 F.3d 453, 456 (9th Cir.1998). CMHS itself has recognized the need for such procedural safeguards and has identified the policy as the procedure which satisfies this constitutional requirement. Indeed, in this very case, CMHS represented to the trial court, correctly, that "the procedures for involuntary administration of medication are governed by CMHS Policy 50000.430.2B, and

have been upheld by the D.C. Court of Appeals in [*Khiem* ]." Ms. Walker argues, not without some force, that

> [i]t is quite an about-face for the CMHS now to contend that its policy "has no legal force." If this is truly the case, the entire process for forcibly medicating patients at St. Elizabeths would be thrown into question, as the procedural safeguards required by *Harper* seem to be, on the government's theory, nonexistent.

In any event, CMHS has effectively conceded that the decision of the trial court cannot be sustained on the theory that there was no material violation of the CMHS policy, for there has in fact been significant noncompliance with the policy.[3] CMHS' alternative theory—that the policy provides no enforceable rights—was not presented to the trial court and, for the reasons stated, we are not prepared to affirm the decision on that ground. Accordingly, the trial court's decision must be reversed, and Ms. Walker's hospital records must be corrected to reflect that the involuntary medication order which led to the administration to her of Haldol was not authorized by law.[4]

## III. CMHS'S APPEAL

■ In the second appeal, CMHS maintains that the trial court erred in

---

3. The CMHS policy requires that the following factors be addressed by the medical director:

  1. The patient's degree of capacity to make an informed decision concerning medication treatment . . . ;
  2. Medication as the treatment of choice . . . . *Attention should be given to the patient's prior response to medication;*
  3. Availability or utility of alternative treatment modalities;
  4. The likelihood of physical harm to the patient or others if medication is not administered;
  5. The patient's prognosis without medication;
  6. The risk of permanent side effects from proposed medication;
  7. The results of consultation with the family/guardian.

CMHS Policy 50000.430.2b, ¶ 6(c)(5)(a).

  In her brief, Ms. Walker argues as follows:
  In short, the policy requires thoughtful decision-making and detailed documentation. Both were lacking in this case. At the outset, the treating psychiatrist never referred the case to the medical director. He did not provide the necessary supporting documentation, and he did not include in the record a clinical note addressing the [seven] specific issues required by the policy. These were not mere technical deficiencies, but a failure on the part of the doctors to comply with the most basic of the policy's requirements. The deficiencies are evident from the record.

As we have noted, Ms. Walker's claim that there were significant deviations from the policy is not seriously contested on this appeal.

4. We do not suggest, by our holding, that if a proper set of procedures were in place and acknowledged by CMHS to be enforceable, the involuntary administration of Haldol to Ms. Walker necessarily deprived her of a liberty interest without due process of law. The record makes it clear that the need to medicate resulted from Ms. Walker's increasingly paranoid condition and from the danger that she posed to herself and to others. Ms. Walker was notified by her treatment team and by the patient advocate, Mr. Boone, of the hospital's decision. In addition, Mr. Boone specifically informed Ms. Walker of her right to mandatory independent review by the Bureau Medical Director and her right to appeal from the Bureau Director's decision to the CMHS Medical Director. When Mr. Boone was unable to persuade Ms. Walker to accept the medication, he referred the matter to the Medical Director, Dr. Keisling. Dr. Keisling in turn examined Ms. Walker himself and reviewed Dr. Dhir's affidavit, as well as two psychiatric assessments and several progress notes from Dr. Schwartz and Dr. Nguyen, before ordering the involuntary injections. But even if these measures appear reasonable in the abstract, they are not in conformity with the CMHS policy, and CMHS does not argue the contrary.

concluding that D.C.Code § 21–592 does not provide a mechanism for returning a committed outpatient to the hospital when the patient is refusing treatment. CMHS urges us to hold that the statutory language limiting the application of section 21–592 to a patient who has left the hospital "without authorization" or has "failed to return as directed" should not be interpreted literally.[5] In denying CMHS's petition, the trial court rejected a similar argument. It read the statutory language narrowly and concluded that section 21–592 applies only to those two narrow categories of patients, neither of which includes Ms. Walker. We think the trial court was right.

The Ervin Act provides "an explicit and expedited timetable" for involuntary hospitalization procedures, *In re Lomax,* 386 A.2d 1185, 1188 (D.C.1978) (en banc), "evinc[ing] the intention of Congress to permit emergency confinement for only short and precisely circumscribed durations." *In re DeLoatch,* 532 A.2d 1343, 1345 (D.C.1987). While the Act permits "the often necessary emergency hospitalization of the mentally ill or those believed to be mentally ill," it also reflects a " 'profound congressional concern for the liberties of the mentally ill.' " *Id.* (quoting *Covington v. Harris,* 136 U.S.App. D.C. 35, 41, 419 F.2d 617, 623 (1969)). This court therefore construes the Act narrowly when its application may result in the curtailment of any person's liberty. *In re Reed,* 571 A.2d 801, 802 (D.C.1990); *see In re Lomax,* 386 A.2d at 1187–1188.

Contrary to CMHS's position, the fact that Ms. Walker refused to take her medication does not bring her within the reach of D.C.Code § 21–592. The plain language of that section permits a court to order the United States Marshal to return a committed patient to the hospital in only two precisely defined situations: when the patient (1) has left the hospital without authorization or (2) has failed to return as directed. The record shows that Ms. Walker was a committed outpatient, not an inpatient, and thus did not need authorization to leave the hospital. In addition, both parties agreed that Ms. Walker regularly attended the outpatient clinic, having missed only one appointment in fifteen months; thus she did not "fail to return as directed." Given these undisputed facts, the trial court could—and did—reasonably conclude that CMHS had not made the requisite showing for a section 21–592 order.[6]

CMHS makes several policy-based arguments in support of its contention that section 21–592 should be read to encompass cases such as this one, but they all founder on the clear and unambiguous statutory language. If CMHS believes that section 21–592 should be more broadly applicable, its recourse must be to the legislature, not to the courts.

## IV. CONCLUSION

In appeal No. 97–FM–734, the orders from which Ms. Walker appeals are reversed, and the case is remanded to the

---

**5.** D.C.Code § 21–592 (2001) provides:
> When a person has been ordered confined in a hospital or institution for the mentally ill pursuant to this chapter and has left such hospital or institution without authorization or has failed to return as directed, the court which ordered confinement shall, upon the request of the administrator of such hospital or institution, order the return of such person to such hospital or institution.

**6.** This is not to say, however, that CMHS did not have other available remedies. Both D.C.Code § 21–521 and Mental Health Rule 16 provide adequate means to return a patient to the hospital without the aid of the United States Marshals Service.

trial court for further proceedings consistent with part II of this opinion. In appeal No. 98–FM–1908, the order from which CMHS appeals is affirmed for the reasons stated in part III of this opinion.

*So ordered.*