**In re G.K.;**

**District of Columbia, Appellant.**

No. 09–FS–510.

District of Columbia Court of Appeals.

Argued Oct. 27, 2009.
Decided April 22, 2010.

Stacy L. Anderson, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellant District of Columbia.

Rosalind W. Johnson, appointed by this court, filed a brief for appellee M.K.L.

Stephen L. Watsky, Washington, DC, appointed by this court, for appellee L.L., filed a statement in lieu of brief, adopting the briefs of appellant District of Columbia and appellee M.K.L.

Jonathan M. Krell, Guardian Ad Litem, for appellee G.K.

Kenneth H. Rosenau for amicus curiae Children's National Medical Center.

Before GLICKMAN, FISHER, and BLACKBURNE–RIGSBY, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

In this matter, the District of Columbia challenges a May 12, 2009, Family Court order (the "Order") that directed the District of Columbia Child and Family Services Agency ("CFSA") to assume responsibility for deciding whether to authorize inpatient psychotropic medications for a child who had been committed to its legal custody. We note at the outset that this is a case of first impression; never before have we been asked to decide who has the authority to provide consent for the administration of psychotropic medication to neglected children. While our immediate task is to analyze the relevant statutes and determine whether the Order at issue was a proper exercise of the Family Court's authority, in doing so, we also hope to provide some guidance for Family Court judges who may face similar circumstances in future cases.

The District argues that CFSA is without statutory authority to authorize non-emergency[1] psychotropic medications for a child in its legal custody and that the trial judge erred in this case by attempting to delegate a discretionary judicial function. For the reasons discussed more fully below, we agree with the District and reverse the Order at issue here. Before we reach our legal analysis, though, we first outline the relevant factual and procedural background leading up to the Family Court's May 12, 2009, Order.

## I. Background

Appellee G.K. was born on March 18, 1998. His mother is (appellee) M.K.L. and

---

1. To be clear, the parties agree that this case did not involve an "emergency" as that term is used in D.C.Code § 16–2338 (2001). Thus, nothing in this opinion should be read to restrict CFSA's authority to provide neglected children with emergency medical treatment.

his father is (appellee) L.L. CFSA removed G.K. and his five siblings from their mother's care when G.K. was twenty-one months old. The District filed a petition alleging that G.K. was a neglected child because his mother was unable to perform her parental responsibilities, due to substance abuse and mental illness, and he had been abandoned by his father. On April 26, 2000, M.K.L. stipulated that her six children were neglected.

G.K. stayed briefly with his father, under the protective supervision of the court, but that order was revoked less than four months after it had been entered. At the permanency review hearing on November 1, 2001, the original trial judge[2] decided that G.K.'s permanency goal should be guardianship with his paternal aunt, T.G. In April 2002, G.K. and two of his brothers were placed in foster care with the A.s while efforts were made to license T.G.'s home for foster care. G.K. and his brothers all had special educational, behavioral, and emotional needs; but G.K.'s were especially severe. On June 28, 2002, nearly nine months after G.K.'s permanency goal had been changed to guardianship with T.G., his case was transferred to another trial judge[3] because she had case responsibility for two related children.[4]

At the permanency review hearing on July 29, 2002, the trial judge set aside G.K.'s permanency goal of guardianship and changed his and his brothers' permanency goals to reunification with their mother (appellee M.K.L.), who apparently had been "making substantial steps toward reunification." However, four months later, the trial judge again changed G.K.'s permanency goal to adoption, noting that he had been removed from his home three years earlier.

In August 2003, G.K. underwent a court-ordered psychiatric evaluation and was diagnosed both with Attention Deficit Hyperactivity Disorder and Oppositional Defiant Disorder. The trial judge ordered that G.K. undergo another mental health evaluation because of his on-going behavioral problems. Before the doctor could complete his evaluation, however, G.K. was hospitalized at the Psychiatric Institute of Washington ("PIW") on an emergency basis because he was exhibiting psychotic behaviors. In 2004, at six years old, G.K. was diagnosed as suffering from Bipolar Disorder.

In anticipation of the court's October 14, 2004, permanency hearing, the parties filed statements regarding their preference for G.K.'s permanent placement. G.K.'s mother, M.K.L., who had since married and moved to North Carolina, indicated that she would like to see G.K. placed with either the G.s (as in T.G., G.K.'s paternal aunt) or the A.s (G.K.'s then-foster family). G.K.'s father, CFSA, and the District all expressed a preference for the G.s. G.K.'s father also filed a written statement of intent to consent to any future adoption petition filed by the G.s. At the October 14, 2004, permanency hearing, the trial judge indicated that G.K. and his brothers would be placed with the G.s and the boys moved to the G.s' home before the Christmas holidays that year.

At the May 3, 2005, permanency hearing, G.K.'s mother executed a written consent to his adoption by the G.s, and on July 28, 2005, the G.s filed petitions to adopt G.K. and his brothers. Although no final decree of adoption terminating parental rights had been entered by the court at

2. Judge William M. Jackson.

3. Judge Nan R. Shuker.

4. These were L.L.'s children with another woman.

the time, the trial judge noted that both parents had previously consented to the adoptions and reasoned: "[u]nder D.C. law, more than thirty days have lapsed since their consents, which makes such consents irrevocable. Accordingly, there are no longer intact biological parental rights for the purposes of medical, mental health and education issues."[5]

On November 16, 2006, G.K.'s school contacted his social worker and recommended that G.K. be assessed for hospitalization because, in the school's view, his behavior had "significantly deteriorated" in the previous few days. Ms. G. took G.K. to a hospital in Virginia the following day and his social worker executed the paperwork to have him admitted for psychiatric treatment. On November 21, 2006, G.K.'s guardian ad litem ("GAL") filed a motion for a psychiatric screening pursuant to D.C.Code § 16–2315, requesting a court order authorizing inpatient hospitalization. The GAL objected to G.K.'s admission to the Virginia hospital because it had been authorized by his social worker; the GAL argued that G.K.'s social worker was not his "guardian" and thus had no authority under D.C. law to admit him for inpatient treatment. The trial judge agreed and issued an order directing the social worker to sign discharge papers for G.K., return him to the District, and have him admitted to a District facility for a twenty-one day psychiatric evaluation pursuant to D.C.Code § 16–2315.

G.K. was eventually discharged from the Virginia hospital on November 30, 2006, and transported to PIW; approximately two weeks later, the trial judge extended G.K.'s inpatient hospitalization for an additional twenty-one days. On December 11, 2006, PIW recommended that G.K. be placed in a residential facility for further treatment. On December 20, 2006, the trial judge issued an order directing that G.K. remain at PIW for mental health treatment pursuant to D.C.Code § 16–2320(a)(4) pending his transfer to a residential treatment facility.

In early 2007, G.K. was accepted into the Pines Residential Treatment Center (the "Pines") in Virginia. On March 7, 2007, the District filed a motion seeking G.K.'s discharge from PIW and his placement at the Pines. G.K. was admitted on April 5, 2007, and he stayed at the Pines for approximately sixteen months. During this time, the G.s finalized their adoption of G.K.'s brothers but decided not to adopt G.K. Because CFSA was unable to identify another family resource for G.K., it contacted his former foster parents, the A.s, who expressed an interest in caring again for G.K. and began visiting him at the Pines in early 2008. By this point, G.K. was almost ten years old. Also during G.K.'s stay at the Pines, on July 15, 2008, the trial judge issued an order prohibiting contact between G.K. and his birth mother, appellee M.K.L.[6]

On July 25, 2008, G.K. was discharged from the Pines and placed in therapeutic foster care with the A.s. On August 8, 2008, the District filed a motion seeking to terminate the parental rights ("TPR") of G.K.'s birth parents, M.K.L. and L.L. After M.K.L. made an appearance at the September 9, 2008, permanency review hearing, however, the trial judge directed the agency to explore placing G.K. with M.K.L. and his maternal aunt. But adoption remained G.K.'s permanency goal after CFSA determined that neither G.K.'s

**5.** As explained in Section II., B., *infra,* this was an incorrect statement of the law with regard to G.K.'s parents' residual parental rights.

**6.** M.K.L. did not appeal this order suspending her visitation rights.

mother nor his aunt were suitable placements.

In early 2009, G.K.'s behavior worsened and there was concern that he was not taking his medication. At the April 14, 2009, permanency review hearing, G.K.'s social worker explained that the A.s were unsure about adopting him because of the questions regarding his long-term prognosis. In addition, the District noted that it had filed the TPR motion because the A.s were reluctant to proceed with the adoption before G.K. was legally free for adoption. The District urged the court to move forward on the TPR motion (which had been filed eight months earlier) because G.K. was already twelve years old by this point and he needed a permanent placement. But the trial judge declined to proceed on the TPR motion, expressing concern that the concomitant appeal to this court would unduly delay permanency for G.K.[7]

Six days later, on April 20, 2009, the A.s transported G.K. to Children's National Medical Center ("Children's") because his behavior was uncontrollable. Based upon the hospital's recommendation, the District filed a motion on April 22, 2009, requesting another twenty-one day inpatient mental health evaluation for G.K. and the trial judge issued an order granting the request.

On May 4, 2009, the District filed a motion for an emergency hearing concerning G.K.'s need for psychotropic medications. The District reported that Children's had contacted G.K.'s mother, M.K.L., seeking her consent to medicate him, but she declined, reportedly saying that "God will heal him" and that "he just needs his mother to get better." The District asked the Family Court to hold a hearing to determine whether M.K.L. was withholding her consent to the psychotropic medication contrary to G.K.'s best interests. An emergency hearing was set for the next day.

At the May 5, 2009, hearing, the District argued that CFSA could not authorize Children's to administer inpatient psychotropic medications because, by statute, that authority rested with a child's parents and/or the court. While CFSA sometimes helps execute certain paperwork in cases where parental consent is given, the District argued that CFSA has no legal authority to override a parent's decision to withhold consent to psychotropic medications. In a May 5, 2009, order, the trial judge found that M.K.L. was withholding her consent contrary to G.K.'s best interests and ordered Children's to "maintain [G.K.] on his current medication and titrate the levels . . . to therapeutic levels." The case was continued for a week, until May 12, 2009.

In its written submission and at the May 12th hearing, the District maintained its position that only a parent or the court has the authority to provide consent for administering inpatient psychotropic medication. The District argued that such a conclusion was compelled, *inter alia,* by a provision in the District of Columbia's Mental Health Consumers' Rights Protection Act of 2001, D.C.Code §§ 7–1231.01–.15 (2001), which mandates that "a hospital providing inpatient mental health services and mental health services to a minor under 16 years of age may not administer psychotropic medication . . . without the consent of a parent or guardian or the authorization of the court." D.C.Code § 7–1231.14(c)(1) (2001). The trial judge disagreed, howev-

---

7. Under D.C. law, a TPR decision is not "final" until the appeal has been decided. *See* D.C.Code § 16–2362(b) (2001).

er, reasoning that the Mental Health Consumers' Rights Protection Act of 2001 does not apply when a child has been admitted for inpatient psychiatric treatment pursuant to D.C.Code § 16–2315.[8]

The trial judge also disagreed with the District's argument that parents of neglected children retain a constitutional and statutory residual right to make medical decisions even after their child has been committed to CFSA's legal custody. In fact, only a week earlier at the May 5, 2009, hearing, the trial court had specifically criticized Children's for attempting to contact M.K.L.[9] Over the District's objections, the trial judge ordered on May 12, 2009, that "Dr. Gerald [CFSA's Director] shall either delegate someone in CFSA or maintain the role himself to make medication decisions, after hearing from doctors as to what medications are medically appropriate during [G.K.'s] hospitalization." Two days after the trial judge issued the Order, the District filed a notice of appeal challenging the "unilateral delegation of judicial authority regarding the administration of psychotropic medications to an executive branch agency."

## II. Analysis

◼ As we have noted, statutory construction involves a "clear question of law" that we review *de novo*. *District of Co-*

*lumbia v. Morrissey,* 668 A.2d 792, 796 (D.C.1995).

By way of background, the Family Court is vested, by statute, with a wide variety of dispositional alternatives for children who have been adjudicated as neglected, *see generally* D.C.Code § 16–2320 (2008 Supp.), including the option of transferring "legal custody" of the child to "a public agency responsible for the care of neglected children." D.C.Code § 16–2320(a)(3)(A) (2008 Supp.). Another subsection of that same statute provides that the Family Court:

> may make such other disposition as is not prohibited by law and as the [Family Court] deems to be in the best interests of the child. The [Family Court] shall have the authority to (i) order any public agency of the District of Columbia to provide any service the [Family Court] determines is needed and which is within such agency's legal authority; (ii) order any private agency receiving public funds for services to families or children to provide any such services when the [Family Court] deems it is in the best interests of the child and within the scope of the legal obligations of the agency.

D.C.Code § 16–2320(a)(5).

While there are several other potentially relevant statutory provisions (that we dis-

---

8. Because we resolve this case on other grounds, we need not decide this issue here. As explained more fully in Section II. A., *infra*, we agree with the District that CFSA does not have the statutory authority to make decisions about psychotropic medication for children in its legal custody. And as explained more fully in Section II. B., *infra*, we conclude that the Family Court erred in this case when it ordered CFSA to assume this responsibility, *inter alia*, because the Family Court failed to account for G.K.'s parents' statutory and constitutional residual parental rights. But since we conclude that the decision regarding G.K.'s medication was within

the ambit of his parents' statutory residual parental rights—subject, of course, to the Family Court's responsibility as *parens patriae* to protect G.K.'s best interests—pursuant to D.C.Code § 16–2301(22), we need not decide whether D.C.Code § 7–1231.14(c)(1) provides an alternative basis for those statutory residual parental rights as well.

9. The trial judge also rejected the District's argument that Dr. Cheryl Williams, Deputy of CFSA's Office of Clinical Practice, could not ethically consent to medication over a parent's objection.

cuss in more detail below), it may be helpful at the outset to summarize the parties' respective positions because the fundamental disagreement in this case concerns the proper interpretation of Section 16–2320. On one hand, the GAL urges the court to focus on the broad language of Section 16–2320(a)(5)—that the Family Court "may make such other disposition as is not prohibited by law" in accordance with the "best interests of the child"—and uphold the Order unless we find that it was not in G.K.'s best interests or that it was "prohibited by law." The District, on the other hand, argues that Section 16–2320(a)(5) cannot be interpreted so broadly because other statutory provisions clearly demonstrate that parents (and in some cases the Family Court) have the exclusive authority to provide consent for a child's inpatient psychiatric treatment.

In sum, for the reasons explained more fully in Section II. A., we agree with the District that CFSA does not have the statutory authority to make decisions about psychotropic medication for a child in its legal custody. And for the reasons explained more fully in Section II. B., we conclude that the Family Court erred in this case when it ordered CFSA to assume this responsibility.

**A. Statutory Framework**

In this case, the Family Court transferred "legal custody" of G.K. to CFSA on January 4, 2001, pursuant to D.C.Code § 16–2320(a)(3)(A), and CFSA retained legal custody of G.K. at all relevant times (including during his hospitalization at Children's in 2009). The District's primary argument is that CFSA was without authority to provide consent for G.K.'s psychotropic medication because the statutory definition of "legal custody" only includes the responsibility to provide the minor with "ordinary medical care."

D.C.Code § 16–2301(21). In fact, as the District notes, the authority to provide consent for psychiatric treatment is vested expressly in the "guardianship of the person of a minor." D.C.Code § 16–2301(20). We note that D.C.Code § 16–2301 includes at least three defined terms that are relevant for our analysis here.

First, "legal custody" is "a legal status created by [Family Court] order which vests in a custodian the responsibility for the custody of a minor...." D.C.Code § 16–2301(21) (2001). By statute, "legal custody" includes:

(A) physical custody and the determination of where and with whom the minor shall live;

(B) the right and duty to protect, train, and discipline the minor; and

(C) the responsibility to provide the minor with food, shelter, education and *ordinary medical care.*

*Id.* (emphasis added). Importantly, the definition also specifies that legal custody "is subordinate to the rights and responsibilities of the guardian of the person of the minor *and any residual parental rights and responsibilities.*" *Id.* (emphasis added).

Second, the phrase "guardianship of the person of a minor" means "the duty and authority to make important decisions in matters having a permanent effect on the life and development of the minor, and concern with his general welfare." D.C.Code § 16–2301(20). These duties and authorities include (but are not limited to):

(A) [the] *authority to consent* to marriage, enlistment in the armed forces of the United States, and major medical, surgical, or *psychiatric treatment;* to represent the minor in legal actions and to make *other decisions concerning the* minor of substantive legal significance;

(B) the authority and duty of reasonable visitation (except as limited by [Family Court] order);

(C) the rights and responsibilities of legal custody when guardianship of the person is exercised by the natural or adoptive parent (except where legal custody has been vested in another person or an agency or institution); and

(D) the authority to exercise residual parental rights and responsibilities when the rights of his parents or only living parent have been judicially terminated or when both parents are dead.

*Id.* (emphasis added).

And third, the phrase "residual parental rights and responsibilities" means "those rights and responsibilities remaining with the parent after transfer of legal custody or guardianship of the person, including (but not limited to) the right of visitation, consent to adoption, and determination of religious affiliation and the responsibility for support." D.C.Code § 16–2301(22).

When read together, these definitions draw a clear distinction between "legal custody" on one hand, and "guardianship" and "residual parental rights" on the other hand. Indeed, the definition of "legal custody" specifies expressly that the rights of one who has "legal custody" are subordinate to the rights of the "guardianship of the person of a minor" and any "residual parental rights." D.C.Code § 16–2301(21)(C). Furthermore, whereas one with legal custody has "the responsibility to provide the minor with ... ordinary medical care" only, *id.*, the "guardianship of the person of a minor" has the "authority to consent to ... psychiatric treatment." D.C.Code § 16–2301(20). And because the statutory definition of "guardianship of the person of a minor"

expressly contemplates the possibility that "legal custody" might be "vested in another person or an agency," D.C.Code § 16–2301(20)(C), we must reasonably infer that "psychiatric treatment" is not within the realm of "ordinary medical care." *See Morrissey, supra,* 668 A.2d 792, 798 (D.C. 1995) ("each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous").[10] In other words, we conclude that "legal custody" does not include the authority to provide consent for psychotropic medications. *Id.*

While it is undisputed that the Family Court never appointed anyone in this case to serve as a "guardianship of the person of a minor" for G.K., the parties disagree as to whether the "duties and authorities" enumerated in the statutory definition for the "guardianship of the person of a minor," D.C.Code § 16–2301(20), remain with the mother, M.K.L., and the father, L.L., as "residual parental rights," or whether they shifted to CFSA with the transfer of legal custody. We note that the statutory definition for "legal custody" includes certain specific rights and duties, whereas the definition for "residual parental rights" is phrased more like a "catch-all" provision to include all "rights and responsibilities remaining with the parent after transfer of legal custody...." D.C.Code § 16–2301(22). In this case, because the Family Court transferred legal custody (and only legal custody) to CFSA, it follows that M.K.L. and L.L. retained all rights and responsibilities normally associated with parenthood, except those enumerated in D.C.Code § 16–2301(21)—and those residual parental rights necessarily included the "authority to consent to ... major medical,

---

10. *See also Odeniran v. Hanley Wood, LLC,* 985 A.2d 421, 427 (D.C.2009) (applying the canon of *expressio unius est exclusio alterius,* which means that "when a legislature makes express mention of one thing, the exclusion of others is implied").

surgical, or psychiatric treatment," D.C.Code § 16–2301(20)(A), since the Family Court had not appointed someone other than G.K.'s natural parents to serve as his "guardianship of the person of a minor." *See Morrissey, supra,* 668 A.2d 792, 798 (D.C.1995) ("each provision of [a] statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous").

■ Interpreting these key statutory provisions—D.C.Code §§ 16–2301(21), (22), and (23)—as we do, we conclude that CFSA was not authorized by statute to provide consent for G.K.'s psychotropic medication because psychotropic medication is not "ordinary medical care"; therefore, we hold that decisions regarding a neglected child's psychotropic medication are presumptively within the ambit of residual parental rights—subject to the Family Court's responsibility as *parens patriae* to intervene, if necessary, to protect a child's best interest.

Having determined that CFSA was not authorized by statute to provide consent for the administration of G.K.'s psychotropic medication, we nevertheless want to address briefly one of the District's other, less persuasive arguments. The District argues that D.C.Code § 4–1303.05 provides further support for its position that the Family Court erred in delegating to CFSA the responsibility of deciding whether to continue G.K.'s psychotropic medications. That statute says that when CFSA has "*physical* custody" of a child, it may:

(1) Authorize a medical evaluation or emergency medical, surgical, or dental treatment, or authorize an *outpatient* psychiatric evaluation or emergency *outpatient* psychiatric treatment, at any time; and

(2) Authorize non-emergency *outpatient* medical, surgical, dental or psychiatric treatment, or autopsy, when reasonable efforts to consult the parent have been made but a parent cannot be consulted.

D.C.Code § 4–1303.05 (emphasis added). As the District notes, the Council amended this provision in 2001, and the only major substantive difference is the addition of the "outpatient" qualifier regarding psychiatric evaluations and treatment.[11] While this change might otherwise provide further support for our ultimate conclusion that "ordinary care" does not include psychotropic medication, we cannot ignore (as the District does) that D.C.Code § 4–1303.05 concerns CFSA's authority to provide medical care for children in its *physical* custody (*i.e.,* not "legal custody").[12] Accordingly, we find this argument less persuasive and instead rest our holding upon the statutory analysis discussed above.

---

**11.** The 1981 version reads:

> When the Department of Human Services has physical custody of a child pursuant to . . . 16–2320, it may:
> (1) Authorize a medical and psychiatric evaluation and/or emergency medical, surgical, dental, or psychiatric treatment at any time; and
> (2) Authorize non-emergency medical, surgical, dental or psychiatric treatment, or autopsy, when reasonable efforts to consult the parent have been made but a parent cannot be consulted.
> D.C.Code § 6–2125 (1981).

**12.** We understand that the statutory definition of "legal custody" includes "physical custody," D.C.Code § 16–2301(21), but because legal custody also includes much more, we find the D.C.Code § 4–1303.05 argument less persuasive, and certainly not dispositive. Indeed, if D.C.Code § 4–1303.05 were intended to answer the question at issue here—whether legal custody includes the authority to provide consent for a neglected child's psychotropic medication—we trust that the Council would have used "legal custody" as opposed to "physical custody" when it drafted the statute.

We must next consider whether the Family Court erred in this case when it ordered CFSA to make decisions about G.K.'s psychiatric treatment.

## B. The Family Court's May 12, 2009, Order

■ We have recognized that people have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs," *In re Walker,* 856 A.2d 579, 586 (D.C.2004), and here, we must determine whether the May 12, 2009, Order—delegating to CFSA the responsibility to make decisions about G.K.'s psychiatric treatment—was a valid exercise of the Family Court's authority. In this case, M.K.L. instructed Children's to discontinue G.K.'s psychotropic medications. The District then petitioned the Family Court for relief and, over M.K.L.'s objection, the Family Court ordered CFSA "to make medication decisions, after hearing from doctors as to what medications are medically appropriate during [G.K.'s] hospitalization." In examining whether the Family Court properly delegated this authority to CFSA, we begin by analyzing the GAL's arguments in support of the May 12, 2009, Order.

As noted above, D.C.Code § 16–2320(a)(5) authorizes the Family Court generally to "order any public agency of the District of Columbia to provide any service the [Family Court] determines is needed and which is within such agency's legal authority." Thus, much like the GAL's argument that the Order should be affirmed because it was in the best interest of the child and it was not "prohibited by law," the GAL similarly posits that the trial judge had the authority (pursuant to D.C.Code § 16–2320(a)(5)) to order CFSA "to provide any service" that she deemed necessary as long as providing that service was "within [CFSA's] legal authority." In that regard, the GAL argues that providing consent for psychotropic medication is a "service" within CFSA's legal authority because one of the "functions and purposes" listed in CFSA's enabling statute is that it shall "[o]ffer[ ] appropriate, adequate, and, when needed, highly specialized, diagnostic and treatment services and resources to children and families when there has been a supported finding of abuse or neglect." D.C.Code § 4–1303.01a (b)(7).

The GAL's argument runs afoul of a well-settled rule of statutory construction, however, because the GAL fails to account for the more specific provision in D.C.Code § 16–2320(a)(4). We have made clear that "a special statute covering a particular subject matter is controlling over a general statutory provision covering the same and other subjects in general terms." *Graham v. Bernstein,* 527 A.2d 736, 739 (D.C.1987) (quoting *Martin v. United States,* 283 A.2d 448, 450–51 (D.C.1971)). Here, D.C.Code § 16–2320(a)(4) specifies that the Family Court has the authority, if necessary, to commit neglected children "for medical, psychiatric, or other treatment at an appropriate facility on an in-patient basis...." [13] Indeed, this subsection of D.C.Code § 16–2320 specifically concerns the power of the Family Court to authorize inpatient psychiatric treatment for neglected children. But the GAL would have this court ignore subsection (a)(4) and affirm the Order based upon the more general provision in subsection (a)(5)(i), which provides that the Family Court may "order any public agency of the District of Columbia to provide any service ... which is

---

**13.** In fact, the trial judge expressly relied on this provision in December 2006 when she ordered that G.K. remain at PIW for mental health treatment pending his transfer to the Pines.

within such agency's legal authority...." D.C.Code § 16–2320.

One could argue that the question of who has the authority to commit a child for inpatient psychiatric treatment is distinct from the question of who may provide consent for psychotropic medication. While we cannot ignore this nuance, we do not think that it is material in this context, *i.e.,* to the extent that we draw guidance from the familiar canon that a provision "covering a particular subject matter is controlling over a general statutory provision covering the same and other subjects in general terms." *Graham, supra,* 527 A.2d at 739. Indeed, as noted above, the two provisions at issue here are both subsections of the same statute; and while subsection (a)(4) concerns inpatient psychiatric treatment specifically, subsection (a)(5)(i) is more general insofar as it authorizes the Family Court to "order any public agency of the District of Columbia to provide *any service.* ..." D.C.Code § 16–2320 (emphasis added). Accordingly, we conclude that the "any service" language in D.C.Code § 16–2320 was not intended to provide the Family Court with the authority to order CFSA to make decisions about a neglected child's psychotropic medication.

■ Moreover, the GAL's argument also fails to account for the residual parental rights of M.K.L. and L.L.[14] "It is a basic principle that parents have a due process right to make decisions concerning the care, custody, and control of their children." *In re A.G.,* 900 A.2d 677, 680 (D.C.

2006) (internal quotation marks and citations omitted). And the Supreme Court has made clear that this "fundamental liberty interest of natural parents ... does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

We note that this case reminds us of the circumstances we faced in *In re K.I.,* 735 A.2d 448 (D.C.1999), where the Family Court stepped in and overruled a natural parent's prerogative with regard to the medical treatment of her infant child (who had previously been adjudicated as neglected). In that case, the Family Court issued a "do not resuscitate" order (the "DNR") over the objection of K.I.'s natural mother. We held that the trial court did not err in issuing the DNR order, after thoroughly considering the mother's arguments. In particular, we noted that the trial court had exercised its authority as *parens patriae* only after it had found, by clear and convincing evidence, both that the DNR was in K.I.'s best interests and that the mother's opposition to the DNR was "unreasonably contrary to K.I.'s well-being." *Id.* at 456; *see also In re J.S.R.,* 374 A.2d 860, 864 (D.C.1977) (holding that the clear-and-convincing standard applies where the court's decision will have potentially "harsh or far-reaching effects on individuals").[15]

The record before us in this case does not provide us with the same basis as the

---

14. While we sometimes focus on M.K.L.'s residual parental rights in this opinion (because she was the one in this case who asserted those rights when she instructed Children's to discontinue G.K.'s medications), we note that L.L. also has residual parental rights unless and until those rights are terminated.

15. *Cf. In re Walker, supra,* 856 A.2d at 586 (noting that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty" and "[t]he government cannot intrude upon [a person's] bodily integrity without a showing of overriding justification and medical appropriateness") (internal quotation marks and citations omitted).

court had before it in *In re K.I.*[16] to determine whether the trial court found by clear and convincing evidence that the administration of psychotropic drugs was in G.K.'s best interests. Nor does the record indicate whether the trial judge found by clear and convincing evidence that M.K.L. was withholding her consent against G.K.'s best interests. Here, Children's sought M.K.L.'s consent to continue administering G.K.'s psychotropic medication. When she refused, CFSA petitioned the Family Court to overrule M.K.L.'s decision, arguing that it was in G.K.'s best interest to continue taking his medications. At the May 5, 2009, hearing, the trial judge ordered Children's to "maintain [G.K.] on his current medication and titrate the levels ... to therapeutic levels," based upon her finding that M.K.L. was withholding her consent contrary to G.K.'s best interests.

But the trial court did not make a finding by clear and convincing evidence that it was in G.K.'s best interests to keep taking his psychotropic medications. Instead, by ordering CFSA in the May 12, 2009, Order "to make medication decisions, after hearing from doctors as to what medications are medically appropriate during the child's hospitalization," the Family Court delegated to CFSA its responsibility as *parens patriae* to determine whether or not it was in G.K.'s best interest to continue taking his psychotropic medications. In fact, there is nothing in the May 12, 2009, Order about G.K.'s best interests. The earlier, May 5, 2009, order says:

Although the Court believes that the biological mother meant well, the Court finds that she does not understand [G.K.'s] current emotional and mental state, she is not aware of the medications that he has been taking, she is not aware of the circumstances that led this Court to conclude that he was a danger to himself, and by not being able to consent to the medications needed for this young man, the mother is acting contrary to the best interests of this child.

But even if this lone sentence in the May 5, 2009, order could be interpreted as a finding by clear and convincing evidence that it was in G.K.'s best interest to continue taking his medication, a plain reading of the subsequent May 12, 2009, Order— "[CFSA shall] make medication decisions, after hearing from doctors as to what medications are medically appropriate during [G.K.'s] hospitalization"—suggests instead that the trial judge intended to delegate this key question to CFSA. While the Family Court has the authority to overrule a natural parent's prerogative regarding a neglected child's psychotropic medication, this discretion must be exercised, where appropriate, after a careful consideration of all the relevant factors. And from the limited record before us here, we cannot say whether the Family Court properly exercised its discretion in this case.[17]

Finally, it is unclear to what extent the May 12, 2009, Order is based upon the trial judge's belief that G.K.'s parents had

---

16. *In re K.I., supra,* 735 A.2d at 450 (describing the trial court's memorandum opinion as "comprehensive" and "extensive and thoughtful").

17. We recognize that this case presented a difficult question, and we commend the trial judge for her extraordinary efforts to take into consideration the opinions of G.K.'s doctors and his GAL. But, as we reiterated in another recent case, while Family Court judges have a "unique vantage point" because of their months (sometimes years) of experience with the parties before them in a particular case, as clearly was the case with the trial judge here, they must be careful to memorialize their findings and reasoning in detail, *inter alia,* for purposes of appellate review. *See In re W.D.,* 988 A.2d 456, 465 n. 10 (D.C.2010).

no residual parental rights.[18] This belief was erroneous in this case because, as we explained in *In re K.I.*, parents of neglected children retain certain residual parental rights.[19] The child's well-being is paramount, however, and sometimes the Family Court must overrule the parent's prerogative in order to protect the best interests of the child. *In re K.I., supra,* 735 A.2d at 454. We reiterate our express acknowledgment that "[a]pplication of the best interests of the child standard in a particular case presents one of the heaviest burdens that can be placed on a trial judge." *Id.* at 456. Indeed, normally we review such "difficult decision[s]" only for an abuse of discretion. *Id.* But that exercise of discretion must be founded upon correct legal standards,[20] and in this case, the trial judge erroneously discounted the validity of G.K.'s parents' residual parental rights. Furthermore, the trial judge failed to make the requisite findings to overrule M.K.L.'s decision to discontinue G.K.'s psychotropic medication. As such, we cannot say that the May 12, 2009, Order was a valid exercise of the Family Court's authority.[21]

### III.  Conclusion

In sum, the trial court erred in delegating to CFSA the ultimate responsibility to make decisions about whether it was in G.K.'s best interest to continue taking his psychotropic medications. We agree with the District that CFSA does not have the statutory authority to make decisions about non-emergency psychotropic medication for children in its legal custody; instead, we conclude that such authority is included among the residual parental rights (and in this case, G.K.'s mother's parental rights had not yet been terminated). Further, the Family Court cannot exercise its discretion as *parens patriae* to intervene and overrule a parent's prerogative unless it finds by clear and convincing evidence that doing so would be in the best interests of the child. In this case, we cannot say from the record before us either that the Family Court gave proper weight to M.K.L.'s residual parental rights, or that it made the requisite findings by clear and convincing evidence to overrule M.K.L.'s decision to discontinue G.K.'s psychotropic medications. Accordingly, we must reverse the Order.

*So ordered.*

18.  It appears that the trial judge might have been acting pursuant to this belief as far back as October 20, 2005, when she remarked in a permanency hearing order that "[u]nder D.C. law, more than thirty days have lapsed since [M.K.L. and L.L. had executed their consents to the G.s' adoption of G.K.], which makes such consents irrevocable. Accordingly, there are no longer intact biological parental rights for the purposes of medical, mental health and education issues."

19.  The trial judge was aware that M.K.L.'s parental rights had not been terminated—and she declined the District's urging to proceed with the TPR process, which had been initiated more than eight months before G.K. was hospitalized in April 2009. While we are not unsympathetic to the trial judge's concerns about the delays sometimes associated with the TPR appellate process, we caution that such concerns should not discourage the Family Court from actively pursuing a TPR, where appropriate.

20.  *See, e.g., Brown v. United States,* 766 A.2d 530, 538 (D.C.2001).

21.  *See, e.g., id.* ("A [trial] court by definition abuses its discretion when it makes an error of law.").